IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PRAIRIE BAND POTAWATOMI NATION,
        Plaintiff,

vs.                                      Case No. 5:24-cv-4066-KHV-RES

JACKSON COUNTY SHERIFF TIM MORSE,

        Defendant.

## Motion to Dismiss Amended Complaint

Sheriff Morse moves to dismiss Plaintiff's Amended Complaint pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction, and Rule 12(b)(6) for failure to state a claim upon which relief may be granted.

### I. Nature of the Matter

Plaintiff Prairie Band Potawatomi Nation (PBPN) claims Jackson County Sheriff Tim Morse unlawfully exercised civil jurisdiction within the PBPN's Reservation. The PBPN seeks a declaration that Sheriff Morse (i) lacks authority to interfere with the Nation's lawful exercise of civil-regulatory jurisdiction and (ii) lacks civil-regulatory jurisdiction. The PBPN also a permanent injunction prohibiting Sheriff Morse from, within the reservation, (a) interfering with the PBPN's lawful exercise of its civil-regulatory jurisdiction and (b) prohibiting Sheriff Morse from exercising "unlawful civil-regulatory jurisdiction" within the reservation.

### II. Statement of Facts

For the purposes of this motion, Defendant accepts the well pleaded facts from the Amended Complaint, *Doc. 33,* but not conclusory allegations or legal conclusions.

### III. Questions Presented

1.     The Amended Complaint should be dismissed for lack of Article III standing and, thus, a lack of subject matter jurisdiction.

2.     The Amended Complaint fails to a state a claim for injunctive or declaratory relief because Sheriff Morse: (a) has "civil jurisdiction" conferred by the Act of January 29, 1861, 12 Stat. 126, to serve civil process within the PBPN reservation; and (b) has jurisdiction conferred by the Kansas Act, 18 U.S.C. § 3243, to enforce Kansas traffic laws on the PBPN reservation.

### IV. Argument and Authorities

**A.**     **Standard for a motion to dismiss.**

    **1.**     **12(b)(1), lack of subject matter jurisdiction.**

A Rule 12(b)(1) motion to dismiss requires a court to dismiss any action for which it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Federal courts are courts of limited jurisdiction and must have a statutory or constitutional basis to exercise jurisdiction. *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002). Dismissal is appropriate when it becomes apparent that jurisdiction is lacking. *Laughlin v. Kmart Corp.*, 50 F.3d 871, 873 (10th Cir. 1995). Plaintiff bears the burden of establishing that jurisdiction is proper. *Montoya*, 296 F.3d at 955.

    **2.**     **12(b)(6), failure to state a claim.**

Rule 12(b)(6) requires a complaint to contain sufficient factual matter "accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plausible claim requires sufficient factual content to allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. While the Court accepts all well-pleaded allegations as true, it need not accept legal conclusions. *Id*. Conclusory statements are not entitled to the presumption of truth. *Id*. at 678-79. The court need not accept "conclusory allegations without supporting factual averments." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678 (cleaned up). To withstand a motion to dismiss, a complaint must contain enough allegations of fact "to state a claim to relief that is plausible on its face." *Twombly*, 550

U.S. at 570. "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555)). In addition to failing to state a claim under Rule 12(b)(6), the Complaint "is inadequate both for failure to provide fair notice and because, even if we take all well-pleaded facts in the complaint as true, the plaintiffs have failed to present a plausible right to relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1249-50 (10th Cir. 2008).

**B.     Plaintiffs lack Article III standing and the Court lacks subject matter jurisdiction. The Amended Complaint does not allege an injury that is "certainly impending" or substantially likely to occur nor does the requested relief remedy any cognizable Article III injury.**

The Complaint does not plausibly allege Article III standing for issuance of an injunction. Federal courts are not "free-wheeling enforcers of the Constitution and laws." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006). The "judicial Power" of the federal courts extends only to "Cases" and "Controversies." U.S. Const. art. III, § 2; *see Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013). This constitutional mandate has long been understood to "to require that a case embody a genuine, live dispute between adverse parties, thereby preventing the federal courts from issuing advisory opinions." *Carney v. Adams*, 592 U.S. 53, 58 (2020). A case or controversy requires standing to sue as "[s]tanding to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Article III standing requires the plaintiff to "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id*. "As the party invoking federal jurisdiction, plaintiff bears the burden of establishing each element of Article III standing. these elements. *Id*. At the pleading stage, the complaint must clearly allege facts demonstrating each element. *Id*.

These gatekeeping requirements are designed to ensure the judiciary's "proper role in our

system of government," one in which the courts do not "usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). When managing local policing, federal courts are to be particularly mindful of their limited role: The "special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law" means courts must show "restraint in the issuance of injunctions against state officers engaged in the administration of the states' criminal laws in the absence of irreparable injury which is both great and immediate." *City of Los Angeles v. Lyons*, 461 U.S. 95, 112 (1983) (citations omitted).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc.*, 578 U.S. at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). A concrete injury "must actually exist." *Id*. A "particularized" injury "'must affect the plaintiff in a personal and individual way.'" *Id*. (quoting *Lujan*, 504 U.S. at 560 n.1). An "imminent" injury "must be 'certainly impending.'" *COPE v. Kan. State Bd. of Educ.*, 821 F.3d 1215, 1222 (10th Cir. 2016) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

"An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a '"substantial" risk that the harm will occur.'" *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 409, 414 n.5). "At the pleading stage, the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). "[G]eneral factual allegations of injury resulting from the defendant's conduct *may* suffice" to support the claim. *Lujan*, 504 U.S. at 561 (emphasis added). "However, '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *COPE*, 821 F.3d at 1221 (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The constitutional requirement of standing requires a concrete and particularized injury that must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks and citations omitted). Standing for prospective injunctive relief requires "a plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004). That is, "the plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future," *id.*, and the threatened injury must be more than merely speculative, but must be "certainly impending." *Id*. Further, declaratory-judgment actions must also "satisfy Article III's case-or-controversy requirement" which "requires identification of a remedy that will redress the individual plaintiffs' injuries." *California v. Texas*, 593 U.S. 659, 660 (2021). The prospective relief sought by the PBPN does not redress any alleged past injury and any future injury alleged is speculative. "A claimed injury that is contingent upon speculation or conjecture is beyond the bounds of a federal court's jurisdiction." *Id., at* 1283–84.

> Under *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), a plaintiff lacks standing to seek prospective injunctive relief if he or she cannot show a real or immediate threat of future harm. *See id*. at 105–06; *see also O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief … if unaccompanied by any continuing, present adverse effects."); *Buchwald v. University of N.M. Sch. of Med.*, 159 F.3d 487, 493 (10th Cir.1998) ("[P]laintiff's standing to seek an injunction ordering her admission to the school based solely on her allegations of past misconduct does not entail standing to seek an injunction prohibiting future use of the disputed preference.").

*Big Elk v. Bd. of Cnty. Comm'rs of Osage Cnty.*, 3 Fed. Appx. 802, 806 (10th Cir. 2001).

The Amended Complaint does not allege ongoing violations or that there is a real and immediate threat of future injury. Plaintiff seeks:

(a)   A declaration that the Defendant lacked authority to interfere with the Nation's exercise of its civil-regulatory jurisdiction on May 28, 2024 at Snak Atak;

(b)     A declaration that the Defendant lacks civil jurisdiction within the Reservation, including jurisdiction to issue parking tickets and threatening to tow vehicles within the Reservation;

(c)     A permanent injunction prohibiting the Defendant from interfering in the lawful exercise of the Nation's civil-regulatory jurisdiction within the Reservation and prohibiting the Defendant from exercising civil jurisdiction within the Reservation;

*Doc. 33,* at 23. Plaintiff seeks a permanent injunction prohibiting Sheriff Morse from (1) interfering in the Nation's exercise of civil-regulatory jurisdiction within the Reservation and (2) exercising civil jurisdiction within the Reservation. *Id.*

It is incumbent upon plaintiff "to demonstrate standing for each form of relief sought." *Lippoldt v. Cole*, 468 F.3d 1204, 1216 (10th Cir. 2006). A plaintiff seeking prospective injunctive relief based on a threat of future harm must show the "threat of injury must be both real and immediate, not conjectural or hypothetical." *Lyons*, 461 U.S. at 101–02. A plaintiff seeking a permanent injunction must show (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) that the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) that the injunction, if issued, will not adversely affect the public interest. *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007).

The Amended Complaint does not allege any ongoing violations or that there is a real and immediate threat of future injury. First the incident involving the Snak Atak was a one-off occurrence that is unlikely to happen again. Second, as more fully set forth in § IV.C, *infra*, pp. 8-15, Sheriff Morse has "civil jurisdiction" to serve civil process on the PBPN Reservation and has jurisdiction to enforce Kansas traffic laws on the PBPN Reservation.

Plaintiff lacks standing under Article III to seek injunctive relief. The Amended Complaint alleges Sheriff Morse, on May 28, 2024, threatened Tribal officials with arrest "if the Snak Atak employees asked the Nation's officials to leave, and they did not leave." *Doc. 33,* ¶ 55. The complaint further alleges, that in "August or early September 2021, the Defendant cited, or threatened to cite, tribal employees [not tribal members] at a hemp production facility within the

Reservation for improper parking." *Id*., ¶ 65. And "in early September or late August 2021, a Sheriff's deputy threatened to tow a tribal member's vehicle parked on the edge of a road on the Reservation." *Id*., ¶ 66.

"[A] plaintiff cannot maintain a declaratory or injunctive action unless he or she can demonstrate a good chance of being likewise injured [by the defendant] in the future." *McAlpine v. Thompson*, 187 F.3d 1213, 1216 (10th Cir.1999) (quotation omitted and alteration in original). Further, "'[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief … if unaccompanied by any continuing, present adverse effects.'" *Id*. (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) (alteration in original)).

When a favorable decision will not afford plaintiff relief, and plaintiff's case is not capable of repetition yet evading review, the court has no jurisdiction under Article III. "[T]he capable-of-repetition doctrine applies only in exceptional situations." *Lyons*, 461 U.S. at 109. It applies only "where the following two circumstances [are] simultaneously present: '(1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again.'" *Spencer v. Kemna*, 523 U.S. 1, 17 (1998) (alterations in original) (quotations and citations omitted). There is no reasonable expectation that the PBPN will be subject to the same action again (as is alleged to have occurred at Snak Atak).

The Amended Complaint seeks to enjoin uncertain or contingent events that may not occur as anticipated, or that may not occur at all, it "does not allege that the conduct which [Plaintiff] seeks to enjoin creates a 'direct and immediate dilemma' for" the PBPN. *Phelps v. Hamilton*, 934 F. Supp. 373, 377 (D. Kan. 1996), *aff'd*, 113 F.3d 1246 (10th Cir. 1997). The relief sought by Plaintiff "necessarily require analysis of facts which are now unknowable and resort to relief which cannot be afforded without violating important principles of federalism." *Id*.

There is a presumption that public officials can be trusted to exercise their official duties and will act lawfully. *Department of State v. Ray*, 502 U.S. 164, 178-89 (1991) (there is a presumption of legitimacy accorded to the Government's official conduct); *United States v. Chemical Foundation*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."). The Amended Complaint acknowledges that Sheriff Morse's interaction on May 28, 2024 was "based on what the owner was telling me was illegal." *Doc. 33,* ¶ 60. The incident involving the Snak Atak was, at most, a one-off event unlikely to occur in the future. Nothing in the Amended Complaint plausibly alleges a likelihood of Sheriff Morse threatening Tribal Officials with arrest during the service of a Cease and Desist Order under tribal tax regulatory authority.

The declaratory relief PBPN seeks does not redress any injury from the May 2024 events involving the Snak Atak, or any citations or threats to cite and/or tow vehicles in 2021. The satisfaction the PBPN might get from a declaratory judgment that Sheriff Morse *might* have acted wrongly "is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998). The Amended Complaint should be dismissed because there is no case or controversy, the PBPN lacks Article III standing, and the requested relief will not redress any injury.

**C.     The Amended Complaint fails to state a claim for declaratory or injunctive relief. Sheriff Morse has jurisdiction in Jackson County, on and off the PBPN Reservation. The Reservation is not excluded from the territorial boundaries of Kansas. Thus, the lands within the Reservation are a part of the State and are subject to its jurisdiction.**

Plaintiff also seeks a declaratory judgment that Sheriff Morse has wrongfully exercised civil jurisdiction by issuing parking violations within the Reservation. *Doc. 33,* 23. Plaintiff contends Sheriff Morse "lacks civil jurisdiction within the Nation's Indian country." *Id.*, ¶ 67. *See also Id.*, ¶ 84 ("lacks civil jurisdiction within the Nation's Indian country"), and at 23 (seeking

declaration "Defendant lacks civil jurisdiction within the Reservation, including jurisdiction to issue parking tickets and threatening to tow vehicles within the Reservation" and enjoining the Sheriff "from exercising civil jurisdiction within the Reservation."). Further, the injunction sought by the PBPN lacks the specificity required by Fed.R.Civ.P. 65(d). Rule 65 requires any "(d) order granting an injunction … must: … (B) state its terms specifically; and (C) describe in reasonable detail--and not by referring to the complaint or other document—the act or acts restrained or required." It is unclear what conduct might comprise the "exercise civil jurisdiction" aside from "issuing parking tickets and threatening to tow vehicles."

Unless excluded by Congress, States are vested with jurisdiction. *Draper v. United States*, 164 U.S. 240, 242–43 (1896) (unless excluded by the state's enabling act, a state possesses the same jurisdiction over its citizens usually enjoyed by the other states of the Union). Congress can, however, strip the States of their inherent jurisdiction on reservations. *Nevada v. Hicks*, 533 U.S. 353, 365 (2001). But, "[t]o begin with, the Constitution allows a State to exercise jurisdiction in Indian country. Indian country is part of the State, not separate from the State." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 636 (2022). *Harkness v. Hyde*, 98 U.S. 476 (1878), held:

> The act of Congress of March 3, 1863, organizing the Territory of Idaho, provides that it shall not embrace within its limits or jurisdiction any territory of an Indian tribe without the latter's assent, but that 'all such territory shall be excepted out of the boundaries, and constitute no part of the Territory of Idaho,' until the tribe shall signify its assent to the President to be included within the Territory. 12 Stat. 808.

*Id*., at 477. The *Harkness* case held a sheriff lacked jurisdiction to serve civil process on the Shoshonee Reservation in Idaho. This conclusion was based on the (mistaken) belief that the treaty with the Shoshonee Tribe excepted their reservation out of the boundaries of the territory and, thus, the Shoshonee reservation constituted no part of the Territory of Idaho. *Id*. Two years later, the Supreme Court then noted the *Harkness* holding was an error (*i.e.*, that the sheriff *did* have jurisdiction to serve civil process on the reservation):

> This court, in *Harkness v. Hyde* (*supra*), relying upon an imperfect extract found in the brief of counsel, inadvertently inferred that the treaty with the Shoshones, like that with the Shawnees, contains a clause excluding the lands of the tribe from territorial or State jurisdiction.

*Langford v. Monteith*, 102 U.S. 145, 147 (1880).

The *Langford* Court addressed Idaho's jurisdiction on the Nez Perce Reservation. The *Langford* Court examined the Act of January 29, 1861, 12 Stat. 126, admitting Kansas to the union and compared it to The Act of March 3, 1863, which provided a temporary government for the Territory of Idaho, 12 Stat. 808, which "contains a clause precisely similar to that in the act admitting Kansas into the Union." *Langford*, 102 U.S. at 147. The *Langford* Court noted Kansas lacked jurisdiction on the *Shawnee* Reservation because a treaty guaranteed that their lands should never be brought within the bounds of any State or Territory, or subject to the laws thereof.[1] 102 U.S. at 146 (citing *United States v. Ward*, McCahon 199, 1 Woolw. 17, 28 F.Cas. 397 (C.C.D. Kan. 1863) (holding the Kansas State courts had no jurisdiction in the lands of the Shawnees)). The *Langford* Court held: "Where no such clause or language equivalent to it is found in a treaty with Indians within the exterior limits of Idaho, the lands held by them are a part of the Territory and subject to its jurisdiction … ." 102 U.S. at 147.

The existing Indian reservations in Kansas are not separate territories. *Kaul v. State Dep't of Revenue*, 266 Kan. 464, 467, 970 P.2d 60 (1998). The 1861 Act for Admission of Kansas into the Union provides:

> [N]othing contained in the said constitution respecting the boundary of said State shall be construed ... to include any territory *which*, *by treaty with such Indian tribe*, is not, without the consent of said tribe, to be included within the territorial limits

---

[1] "In the mid-Nineteenth Century, the Shawnee Tribe held 1.6 million acres of land in Kansas pursuant to 1825 and 1831 treaties with the United States." *Shawnee Tribe v. United States*, 423 F.3d 1204, 1208 (10th Cir. 2005). The Shawnee, however, ceded most of the land back to the United States. Treaty with the Shawnees, May 10, 1854, U.S.-Shawnee, 10 Stat. 1053. In 1869, the Shawnee agreed to be "incorporated into and ever remain a part of the Cherokee Nation" and relocated to Indian territory in Oklahoma and further agreed the "Shawnees shall abandon their tribal organization." *Id.*, at 1209–10. Public Law 106-568, the Shawnee Tribe Status Act of 2000, again gave federal recognition to the Shawnee Tribe. Thus, the Shawnee are not longer a tribe in Kansas and have no reservation in Kansas.

> or jurisdiction of any State or Territory; but all such territory shall be excepted out of the boundaries, and constitute no part of the State of Kansas.

12 Stat. 127 (emphasis added). For reservation land to be excluded from the jurisdiction of the State of Kansas, the treaty with the Tribe must exclude the reservation from the state boundary or must expressly require consent of the Tribe to be included within the boundary of the State or territory. *Sac & Fox Nation of Missouri v. Pierce*, 213 F.3d 566, 576–77 (10th Cir. 2000). *See also Langford,* 102 U.S. at 147. This binding precedent held the boundaries of the State of Kansas excludes *only* "those lands which Indian tribes reserved unto themselves 'by treaty' with the United States."

> To our knowledge, the only federal decision construing the applicable provision of the 1861 Act is *United States v. Ward*, 28 F. Cas. 397 (C.C.D.Kan. 1863) (No. 16,639). Ward involved the question of the United States' criminal jurisdiction over the murder trial of a non-Indian defendant whose victim was also non-Indian. The murder occurred on lands of the Kansas Tribe of Indians within the external boundaries of the State of Kansas. Holding the State of Kansas, not the United States, had jurisdiction over the matter, Supreme Court Justice Miller, riding circuit, reasoned that under the Act, all territory not previously exempted from the boundaries of the State of Kansas by treaty between the United States and an Indian tribe "was included within the state, within its jurisdiction and within its territory; and this irrevocably, unqualifiedly, and exclusively." *Id*. at 399.

*Pierce,* 213 F.3d at 576–77.

> We agree with Justice Miller's able construction of the 1861 Act for it is consistent with the Act's plain language. The Act for Admission excludes from the boundaries of the State of Kansas only those lands which Indian tribes reserved unto themselves "by treaty" with the United States. The Tribes fail to identify any language in any of the treaties provided us which we might construe as excluding their lands from the boundaries of the State.

*Id.* at 577. In *United States v. Ward*, the issue was whether state or federal officials had jurisdiction over the reservation of the Kansas [or Kanza] Tribe which was comprised of a tract, nine miles by fourteen in Waubaunsee, Morris, and Lyons Counties. 28 F.Cas. at 397. As noted above, it was held that the Act of January 29, 1861, which admitted Kansas "into the Union on an equal footing with the original States in all respects whatever," abrogated the Act of June 30, 1834 (the Indian

Intercourse Act, which designated country west of the Mississippi not within Missouri, Louisiana, or Arkansas as Indian country and giving the United States jurisdiction). *Id.*, at 399.

Defendant acknowledges this Court's citation to *Francisco v. State*, 113 Ariz. 427, 556 P.2d 1 (1976), for the holding that an *Arizona* sheriff lacked authority to serve process on the Papago Indian Reservation. That holding, however, was premised on the fact the Papago Indian Reservation was set aside for the exclusive use and occupancy of the Papago Indian tribe. 556 P.2d at 4. This result in *Francisco* was consistent with the holding in *McClanahan v. State Tax Comm'n of Arizona*, 411 U.S. 164 (1973), that

> the reservation of certain lands for the exclusive use and occupancy of the Navajos and the exclusion of non-Navajos from the prescribed area was meant to establish the lands as within the exclusive sovereignty of the Navajos under general federal supervision.

*Id.,* at 174–75 (citing *Warren Trading Post Co. v. Arizona State Tax Comm'n*, 380 U.S. 685, 690 (1965) ("Congress has, since the creation of the Navajo Reservation … left the Indians on it largely free to run the reservation and its affairs without state control.")).

> [S]ince the signing of the Navajo treaty, Congress has consistently acted upon the assumption that the States lacked jurisdiction over Navajos living on the reservation. Thus, when Arizona entered the Union, its entry was expressly conditioned on the promise that the State would 'forever disclaim all right and title to . . . all lands lying within said boundaries owned or held by any Indian or Indian tribes, the right or title to which shall have been acquired through or from the United States or any prior sovereignty, and that until the title of such Indian or Indian tribes shall have been extinguished the same shall be and remain subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States.' Arizona Enabling Act, 36 Stat. 569.

*McClanahan*, 411 U.S. at 175. Unlike Kansas, *Arizona* tribes and reservations were expressly *excluded* from the territorial jurisdiction of Arizona when Arizona was granted statehood. Thus, the presumption in Arizona is that state jurisdiction does not extend onto reservations absent a grant from Congress. The reverse is true for Kansas, jurisdiction was conferred upon the State with the Act of Admission, absent a clause in a treaty that excludes Indians reservations from territorial

limits. *Langford,* 102 U.S. at 147; *Sac & Fox Nation of Missouri*, 213 F.3d at 576-77. The treaties with the PBPN do not exclude any Indian lands from Kansas' boundaries. *See Treaty with the Potawatomi Nation*, 1846., 9 Stat. 853 (*Doc. 10-1*); *Treaty with the Potawatomi*, 1861, 12 Stat. 1191 (*Doc. 10-2*); and Treaty with the Potawatomi, 1867, 15 Stat. 531 (*Doc. 10-3*).

Traffic offenses and infractions fall with Kansas' criminal jurisdiction when applied to the PBPN Reservation. *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), distinguished between civil/regulatory laws and criminal/prohibitory laws with respect to the grant of criminal jurisdiction under Public Law 280. *Id.,* at 209. If state law generally prohibits certain conduct, it falls within the grant of criminal jurisdiction, "[t]he shorthand test is whether the conduct at issue violates the State's public policy." *Id.* Kansas' traffic laws generally, and its statute on parking and standing are prohibitory, not merely regulatory. K.S.A. 8-1571,[2] *see also* K.S.A. K.S.A. 8-1501 to 8-15,115. Kansas' current traffic laws were enacted in 1974 when the Uniform Act Regulating Traffic On Highways was revised. L. 1974, ch. 33. That Act provided that:

> The provisions of this act shall be applicable and uniform throughout this state and in all cities and other political subdivisions therein, and no local authority shall enact or enforce any ordinance in conflict with the provisions of this act unless expressly authorized; however, local authorities may adopt additional traffic regulations which are not in conflict with the provisions of this act.

K.S.A. 8-2001. The Act allows for the arrest of the violator for "any violation of any provision of the uniform act regulating traffic on highways." K.S.A. 8-2104. The Act also permits, in lieu of arrest, the issuance of a written traffic citation for nonfelony violations of the Act. K.S.A. 8-2106.

In *Hackford v. Utah*, 827 Fed. Appx. 808, 812 (10th Cir. 2020), the Tenth Circuit held Utah could enforce its traffic laws on reservations. Defendant acknowledges that this Court distinguished *Hackford*. *Doc. 25*, at 13 (stating the Tenth Circuit "found that the state had criminal

---

[2] This statute provides, "**Stopping, standing or parking prohibited in specified places**. (a) Except when necessary to avoid conflict with other traffic, or in compliance with law or the directions of a police officer or official traffic-control device, no person shall: … ."

jurisdiction because the incident did not occur on the reservation and the motorist was not an Indian."). Defendant directs the court to the text of that decision which points out that for Hackford's *first* lawsuit, the basis relied on by the district court was that the offense was not on a reservation and that Hackford was not an Indian. *Id.*, at 810 (citing *Hackford v. Utah*, Nos. 2:13-CV-00276, 2:13-cv-1070, 2015 WL 4717639, at *1–2 (D. Utah Aug. 7, 2015)). However, for Hackford's *second* and *current* lawsuit (*i.e.*, the case before the Tenth Circuit), it was "'stipulated that the alleged offense occurred in Indian Country.'" *Id.*, at 811. Thus, *Hackford* held Utah traffic laws could be enforced in Indian Country.

Also, in *St. Germaine v. Cir. Ct. for Vilas Cnty.*, 938 F.2d 75 (7th Cir. 1991), the Seventh Circuit held the grant of criminal jurisdiction to Wisconsin to enforce its criminal laws in "all Indian country within the state"[3] gave Wisconsin gave the jurisdiction to enforce its traffic statute on reservations. 938 F.2d at 76. The enforcement of state traffic laws by the imposition of fines and criminal sanctions does not impinge tribal attributes of sovereignty over tribal members and tribal territory. *Id.,* at 78. The court, in *St. Germaine*, observed Wisconsin's traffic laws were "an important matter of Wisconsin public policy to protect the lives and property of all users of its highways, on or off the reservation, Indians or non-Indians." *Id.,* at 77.

The PBPN prohibits driving on public and/or state highways within the reservation without a valid driver's or chauffeur's license. Potawatomi Code, 17-4-5(a).[4] The PBPN also expressly authorize "Any duly sworn Law Enforcement Officer, including Law Enforcement Officer of the State of Kansas, … to enforce the provisions of this chapter and to execute and serve all warrants and processes issued by the Potawatomi Tribal Court under any law of the Prairie Band of Potawatomi." Potawatomi Code 17-10-37(A). The PBPN issues motor vehicle registration and

---

[3] Public Law 280, 67 Stat. 588 (1953), as amended 18 U.S.C. § 1162.
[4] The Prairie Band Potawatomi Nation Law and Order Codes are accessible at: http://www.codepublishing.com/KS/Potawatomi/, accessed March 31, 2025.

{T0486213}                                  - 14 -

vehicle titles, Potawatomi Code, ch. 17-10, and prohibits driving without a valid license within the Reservation, *id.,* 17-4-5(A), but the PBPN does not issue drivers licenses. *See Procedures for issuing tribal tags,* https://www.pbpindiantribe.com/tribal-tags/, visited March 28, 2025 (instructing that "a valid Kansas Driver's license will be required" for issuance of a tribal license plate). *See also* K.S.A. 8-235(a) (no person "shall drive any motor vehicle upon a highway in this state unless such person has a valid driver's license"). When concluding the State's criminal jurisdiction permitted enforcement or traffic laws in Indian County, the *St. Germaine* Court, held the States' public policy of life-safety embodies by its traffic laws does not impinge upon the attributes of tribal sovereignty over both their members and their territory. 938 F.2d at 77-78.

State officials, including Sheriff Morse, have jurisdiction to serve civil process on the PBPN Reservation. Likewise, State officials, including Sheriff Morse, have jurisdiction to enforce Kansas traffic laws on the PBPN Reservation. The Amended Complaint fails to describe, in reasonable detail, the act or acts sought to be restrained. *See* Rule 65(d). The PBPN are not entitled an injunction or to declaratory relief.

## Conclusion

The Amended Complaint should be dismissed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction, and Rule 12(b)(6) for failure to state a claim upon which relief may be granted.

**Fisher, Patterson, Sayler & Smith, LLP**
3550 SW 5th Street | Topeka, Kansas 66606
Tel: (785) 232-7761 | Fax: (785) 232-6604
dcooper@fpsslaw.com | cbranson@fpsslaw.com
tokeefe@fpsslaw.com

<u>s/David R. Cooper</u>

| | |
|---|---|
| David R. Cooper | #16690 |
| Charles E. Branson | #17376 |
| Timothy A. O'Keefe | #18525 |

**Attorneys for Defendant**

## Certificate of Service

On March 31, 2025, the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record:

Jere D. Sellers, KS #16406 | Rachel E. North, D.Kan. #79121
STINSON LLP | 1201 Walnut Street, Suite 2900 | Kansas City, Missouri 64106
Tel: (816) 691-3190 | Fax: (816) 412-8195
jere.sellers@stinson.com | rachel.north@stinson.com

Carol E. Heckman, *Pro Hac Vice* | Klint A. Cowan, *Pro Hac Vice*
LIPPES MATHIAS | 50 Fountain Place, Suite 1700 | Buffalo, New York 14202
Tel: (716) 853-5100 | Fax: (716) 853-5199
checkman@lippes.com
kcowan@lippes.com
**Attorneys for Plaintiff**

**s/David R. Cooper**
