**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS**

| | | |
|---|---|---|
| PRAIRIE BAND POTAWATOMI NATION, a federally recognized Indian tribe, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 5:24-cv-04066-KHV-RES |
| JACKSON COUNTY SHERIFF TIM MORSE, in his official capacity, | ) ) ) | |
| Defendant. | ) ) | |

---

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND BRIEF IN SUPPORT**

---

# Table of Contents

MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT ....................................... 1

SUMMARY OF THE ARGUMENT ................................................................... 1

STIPULATED MATERIAL FACTS ("SMF") ......................................................... 2

    A.    The Nation's Reservation and Government .................................................. 2

    B.    Civil-regulatory jurisdiction within the Reservation ...................................... 4

    C.    The Snak Atak incident ................................................................ 6

    D.    The parking enforcement incident .................................................... 18

ADDITIONAL MATERIAL FACTS ("AMF") ......................................................... 19

    A.    Additional background ............................................................... 19

    B.    Additional facts regarding the Snak Atak incident ...................................... 19

    C.    Additional Facts regarding the O Road incident ........................................ 23

LEGAL STANDARD ............................................................................. 23

ARGUMENTS & AUTHORITIES ................................................................... 24

    I.    Sheriff Morse unlawfully interfered with the Nation's exercise of its civil-regulatory jurisdiction at Snak Atak. ................................................................. 24

    II.    Sheriff Morse lacks authority to enforce Kansas' civil-regulatory parking and towing statutes, Kan. Stat. Ann. §§ 8-1569 and 8-1570, against Nation members on the Reservation. 31

        A. The Sheriff threatened to tow a Nation member's tribally tagged car. ................... 31

        B. The Kansas laws regarding parking and towing cars do not apply within the Reservation. ................................................................. 32

        C. The Kansas laws regarding parking and towing cars are civil-regulatory—not criminal. ........................................................................... 33

        D. Kansas has never acquired civil-regulatory jurisdiction over the Reservation. ..... 35

        E. Federal law preempts the Sheriff's exercise of civil-regulatory jurisdiction within the Reservation. ................................................................... 36

    III.    The Nation satisfies the elements required for permanent injunctive relief. ............... 38

CONCLUSION ................................................................................. 42

# Table of Authorities

## Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................................................................ 31

*Annis v. Dewey Cnty. Bank*,
335 F. Supp. 133 (D.S.D. 1971) .................................................................................... 47

*Biester v. Midwest Health Services, Inc.*,
77 F.3d 1264 (10th Cir. 1996) ....................................................................................... 31

*Burdett v. Harrah's Kansas Casino Corp.*,
260 F. Supp. 2d 1109 (D. Kan. 2003) ........................................................................... 49

*California v. Cabazon Band of Mission Indians*,
480 U.S. 202 (1987) ........................................................................................................ 45

*Chemehuevi Tribe v. McMahon*,
2016 WL 4424970 (C.D. Cal. Aug. 16, 2016) .............................................................. 51

*Fisher v. Dist. Ct. of Sixteenth Jud. Dist. of Montana*,
424 U.S. 382 (1976) ........................................................................................................ 39

*HCI Distribution, Inc. v. Peterson*,
110 F.4th 1062 (8th Cir. 2024) ...................................................................................... 48

*Kennerly v. Dist. Ct. of Ninth Jud. Dist. of Mont.*,
400 U.S. 423 (1971) ........................................................................................................ 47

*Kickapoo Tribe v. Shoemaker*,
No. 00-4059-SAC, Decl. J. and Perm. Inj., 3 (D. Kan. filed Feb. 9, 2000) .............. 46

*McClanahan v. State Tax Comm'n of Arizona*,
411 U.S. 164 (1973) ................................................................................................ *passim*

*Montana v. United States*,
450 U.S. 544 (1981) ........................................................................................................ 34

*New Mexico v. Mescalero Apache Tribe*,
462 U.S. 324 (1983) ................................................................................................... 39, 48

*People v. Ganaway*,
568 P.3d 780 ..................................................................................................................... 38

*Prairie Band of Potawatomi Indians v. Pierce*,
253 F.3d 1234 (10th Cir. 2001) .............................................................................. *passim*

*Rodewald v. Kansas Dep't of Revenue*,
297 P.3d 281 (2013) .................................................................................................. 42, 43

*Scott v. Harris*,
550 U.S. 372 (2007) ........................................................................................................ 31

*Seneca Nation of Indians v. Paterson*,
2010 WL 4027795 (W.D.N.Y. Oct. 14, 2010) ............................................................. 52

*Seneca–Cayuga Tribe of Oklahoma v. State of Okla.*,
    874 F.2d 709 (10th Cir. 1989) ................................................................ 53

*State v. Jefferson*,
    1991 WL 12018405 (Kan. Ct. App. Mar. 15, 1991) (unpublished) ......................... 44

*Tax Comm'n v. Wamego Store LLC*,
    (Prairie Band Dist. Ct. filed June 28, 2024) ................................................ 25

*Tax Comm'n v. Wamego Store LLC*,
    No. CV-2024-OT-0013.CV (Prairie Band Dist. Ct. filed June 30, 2024) ................. 26

*United States v. Mazurie*,
    419 U.S. 544 (1975) ........................................................................... 34

*United States v. Morris*,
    754 F. Supp. 185 (D.N.M. 1991) ............................................................. 47

*Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Lawrence*,
    22 F.4th 892 (10th Cir. 2022) .............................................. 41, 51, 52, 53

*White Mountain Apache Tribe v. Bracker*,
    448 U.S. 136 (1980) ..................................................................... 41, 48

*Williams v. Lee*,
    358 U.S. 217 (1959) ........................................................................... 39

**Statutes**

18 U.S.C. § 1151 ...................................................................................... 7
18 U.S.C. § 1161 .................................................................................... 34
25 U.S.C. § 1322(a) ................................................................................ 46
25 U.S.C. § 1322 ................................................................................... 47
25 U.S.C. § 1326 ................................................................................... 47
25 U.S.C. § 2801 ..................................................................................... 8
25 U.S.C. § 2804a .................................................................................... 8
Prairie Band Potawatomi Nation Code, §§ 15-5-38, 15-5-67 ................................... 27
Indian Commerce Clause, Art. 1, § 8, cl. 3 ...................................................... 41
Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 et seq. ........................................ 8
Kan. Stat. Ann. § 17-7662 ......................................................................... 12
Kan. Stat. Ann. § 19-813 ............................................................................ 9
Kan. Stat. Ann. § 8-1569 ................................................................. 6, 42, 43
Kan. Stat. Ann. § 8-1570 ................................................................. 6, 42, 43
Kan. Stat. Ann. § 8-303 ........................................................................... 43
Kansas Act, 18 U.S.C. § 3243 ....................................................................... 9
Omnibus Indian Advancement Act,
    Pub. L. 106–568, 114 Stat 2868 (Dec. 27, 2000) ......................................... 49
Prairie Band Potawatomi Nation Code, § 4.01(a) ................................................. 14
Prairie Band Potawatomi Nation Code, Title 15, Criminal Offenses ............................... 8

CORE/0835793.0018/238354448.2

Prairie Band Potawatomi Nation Code, § 1-1-1 ................................................................................ 9

## Other Authorities

Pattern Inst. Kan. Civil 121.48 (March 2023 Update)..................................................................... 44
Tobacco Compact § 4.01(a) (Feb. 17, 2016) ................................................................................. 34

## Rules

Fed. R. Civ. P. 56.......................................................................................................................... 6 , 31
D. Kan. Rule 56.1 ............................................................................................................................... 6

## Regulations

88 Fed. Reg. 45,909 (July 18, 2023)................................................................................................ 8

CORE/0835793.0018/238354448.2

## MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

The Prairie Band Potawatomi Nation ("Nation") moves for summary judgment against Sheriff Tim Morse on its claims for declaratory and injunctive relief. Fed. R. Civ. P. 56; D. Kan. Rule 56.1. Specifically, the Nation seeks declarations that Sheriff Morse (i) violated the Nation's sovereign rights on its Reservation on May 28, 2024, when he interfered in the Nation's lawful exercise of civil-regulatory jurisdiction over the Snak Atak convenience store by intimidating the Nation's onsite officials and threatening to arrest those officials for criminal trespass; and (ii) lacked authority to threaten to tow a Nation member's parked, tribally tagged vehicle on the Reservation on August 26, 2021 under a Kansas civil-regulatory law. In addition, the Nation seeks injunctive relief prohibiting the Sheriff from interfering with the Nation's lawful exercise of civil-regulatory jurisdiction on the Reservation and from enforcing state civil-regulatory parking and towing laws (Kan. Stat. Ann. §§ 8-1569, 8-1570) against Nation members on the Reservation.

## SUMMARY OF THE ARGUMENT

The Nation has civil-regulatory jurisdiction over its Reservation and had civil-regulatory jurisdiction over Snak Atak. Federal common law prohibits the Sheriff from interfering with the Nation's exercise of civil-regulatory jurisdiction because doing so infringes on the right of the Nation to govern itself on the Reservation. If the Sheriff could stop Nation officials engaged in the lawful exercise of civil-regulatory jurisdiction on the Reservation by arresting—or intimidating and threatening to arrest—them, as he did in this case, then the Nation's federally protected authority to regulate Reservation activities would be meaningless.

Meanwhile, the Sheriff lacks civil-regulatory jurisdiction over Nation members on the Reservation. Kansas could acquire such jurisdiction by following the 25 U.S.C. § 1322(a)

- 1 -

process, but that requires obtaining the Nation's consent. Kansas has never sought such jurisdiction. Nor has the Nation ever consented to Kansas acquiring it. The Sheriff applied Kansas civil-regulatory laws regarding parking and towing vehicles to a Nation member whose tribally tagged car was parked on the Reservation. The Sheriff simply lacks authority to enforce such civil-regulatory laws against Nation members on the Reservation. The Nation is the government with authority to enforce tribal parking and towing laws against its members on its Reservation.

In sum, the Sheriff violated federal common law by attempting to stop the Nation's exercise of civil-regulatory jurisdiction over Snak Atak and by exercising civil-regulatory jurisdiction over a Nation member whose tribally tagged vehicle was parked on the Reservation.

## STIPULATED MATERIAL FACTS ("SMF")[1]

Below, the Nation restates the stipulated facts from the Pretrial Order (Dkt. #67) followed by additional non-stipulated facts (supported by record citations) to support this motion.

### A. The Nation's Reservation and Government

1.      The Prairie Band Potawatomi Nation ("Nation") possesses a reservation established by the Treaty with the Pottawautomie Nation, 9 Stat. 853 (June 17, 1846), ("Reservation") in northeastern Kansas.

2.      Under 18 U.S.C. § 1151, all lands within the Reservation are Indian country.

3.      The Nation's government is located on the Reservation and includes the offices of the Tribal Council (the Nation's elected government), the Judicial Council (the Nation's independent judicial branch of government), the Gaming Commission, and the Tax Commission. Article I, Section 1 of the Nation's federally approved constitution states:

---

[1] The parties stipulated to these facts in the Pretrial Order, 2–14, Dkt. No. 67 (Jan. 20, 2026).

> Section 1. The authority and jurisdiction of the Prairie Band
> Potawatomi Nation shall extend to the fullest extent possible,
> including, without limitation, (a) to any and all persons, including
> non-members and members of the Prairie Band Potawatomi Nation
> and including any corporation, other entity or any person located or
> doing business on the Nation's Reservation and (b) to all surface,
> subsurface or other territory or real or personal property of any
> nature within the Nation's Reservation.

4.      The Nation provides public services within the Reservation, including fire

protection and emergency services, law enforcement, early childhood education, health care,

community centers, historic preservation, environmental protection, wildlife conservation, land

maintenance, road and bridge maintenance, transportation, and vehicle licensing and registration.

5.      The Nation also operates businesses within the Reservation including a gaming

facility (as authorized by the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 et seq., and the

Tribal-State Gaming Compact, 88 Fed. Reg. 45,909 (July 18, 2023)), a convenience store, and a

hemp farm and hemp processing plant.

6.      The Nation has also established a police department authorized to promote public

safety, protect persons living in the Reservation, preserve the peace, and work with other law

enforcement agencies to promote the peace. The Nation has authorized its law enforcement

officers to make arrests and to carry handguns, other firearms, and other weaponry for their

personal protection and the protection of others. The tribal police are cross-deputized by the

Bureau of Indian Affairs, Inter-Governmental Cross Deputization Agreement of 1999 for Law

Enforcement in the Prairie Band of Potawatomi Tribe, Ex. 1 - PBPN-000001–09 (Dec. 20, 1999),

and have Special Law Enforcement Commissions under 25 U.S.C. §§ 2801 and 2804a. The tribal

police exercise criminal jurisdiction over Indians within the Reservation under tribal criminal

law codified at Title 15, Criminal Offenses of the Potawatomi Law and Order Code.

CORE/0835793.0018/238354448.2

7.      Jackson County, Kansas Sheriff Tim Morse is a former member of the Nation's police department from November 1999 to July 2000. Prairie Band Potawatomi Nation Police Department Application and Personnel Files for Officer Tim Morse, Ex. 2 - PBPN-00355–402, PBPN-00404.

8.      Sheriff Morse has been the Jackson County Sheriff since June 2011.

9.      Pursuant to the Kansas Act, 18 U.S.C. § 3243:

> Jurisdiction is conferred on the State of Kansas over offenses committed by or against Indians on Indian reservations, including trust or restricted allotments, within the State of Kansas, to the same extent as its courts have jurisdiction over offenses committed elsewhere within the State in accordance with the laws of the State. . . .

10.     Pursuant to Kan. Stat. Ann. § 19-813:

> It shall be the duty of the sheriff and undersheriffs and deputies to keep and preserve the peace in their respective counties, and to quiet and suppress all affrays, riots and unlawful assemblies and insurrections, for which purpose, and for the service of process in civil or criminal cases, and in apprehending or securing any person for felony or breach of the peace . . . ."

11.     The criminal jurisdiction conferred by the Kansas Act, 18 U.S.C. § 3243, extends to Sheriff Morse, his undersheriff and his deputies.

**B.      Civil-regulatory jurisdiction within the Reservation**

12.     The Nation enacted the Potawatomi Law and Order Code. Section 1-1-1 of the Code provides as follows:

> 1-1-1 Territory, Persons and Property Affected.
>
> As required by the tribal constitution, the authority and jurisdiction of the Prairie Band Potawatomi Nation shall extend to the fullest extent possible, including, without limitation, to any and all persons, including non-members and members of the Prairie Band Potawatomi Nation and including any corporation, other entity or any person and to all surface, subsurface or other territory or real or

- 4 -

personal property of any nature. The authority and jurisdiction of the Nation shall apply pursuant to this Code to each of the following:

(A)  The Prairie Band Potawatomi Indian Reservation, including all lands, islands, waters, roads, and bridges or any interests therein, whether trust or non-trust status and notwithstanding the issuance of any patent or right-of- way, within the boundaries on the Reservation as established in Article 4 of the Treaty with the Potawatomi Nation, dated June 17, 1846, 9 Stat. 853, and such other lands, islands, waters or any interest therein hereafter added to the Reservation.

(B)  All persons and property within any existing or future territory to which it is possible to extend the Nation's jurisdiction or authority, including, without limitation, territory within the exterior boundaries of Indian country of the Nation or of its members and all property held by the United States in trust for the Prairie Band Potawatomi Nation or in trust for a member of the Prairie Band Potawatomi Nation.

(C)  All members of the Tribe, wherever located, exercising any tribal rights pursuant to federal, tribal or state law.

(D)  All persons and property outside the exterior boundaries of territory that is subject to the jurisdiction and authority of the Nation, to the extent not prohibited by federal law, including, without limitation, any person who personally or through an agent does any of the following insofar as any claim brought in Tribal Court arises from the doing of such act:

> (1)  The transaction of any business of the Reservation;
> (2)  The commission of a tortuous act on the Reservation;
> (3)  Contracting to insure any person, property or risk located on the Reservation at the time of contracting; and
> (4)  The act of sexual intercourse on the Reservation with respect to which a child may have been conceived.
> (5)  The commission of a Covered Crime on the Reservation, except if victim and defendant are both non-Indian, other than Obstruction of Justice or Assault of Tribal Justice Personnel.

(E)  For any reservation land located outside of Jackson County, Kansas, this tribal Code shall be interpreted to substitute for Jackson County and Kansas the county and state in which such land is located.

CORE/0835793.0018/238354448.2

(Amended by PBP TC No. 2008-121, May 22, 2008; amended by
PBP TC No. 2023-276, September 21, 2023)

Code, § 1-1-1, Ex. 3 - PBPN000742.

13.     Title 10 of the Code establishes the Prairie Band Potawatomi Tax Commission

("Tax Commission") as the Nation's taxing authority, *id*. § 10-1, creates a tobacco excise tax, *id*.

§ 10-2, a gross receipts sales tax (including on alcohol sales), *id*. § 10-3, and a motor fuel tax, *id*.

§ 10-6-5.

14.     Title 13 of the Code contains business licensing regulations for businesses within

the Reservation. *Id*. § 13.

15.     Title 29 of the Code contains regulations for selling alcohol on the Reservation,

which applies to all sellers of alcohol on the Reservation.

## C.     The Snak Atak incident

### i.     Snak Atak's consent to the Nation's civil-regulatory jurisdiction

16.     On or about January 29, 2024, applications for a tribal business license, tobacco

retailer license, liquor retailer license, and tribal motor fuels retailer license were submitted by

Amit Mishra on behalf of Wamego Store LLC, doing business as Snak Atak Travel Plaza ("Snak

Atak").

17.     Snak Atak is a non-Indian owned company organized under the Kansas revised

limited liability company act, Kan. Stat. Ann. § 17-7662, *et seq*., and located on nonmember

owned fee land within the Reservation. Ex. 4 - PBPN-000226–32. Mishra owns more than five

percent of Wamego Store, LLC, and was an organizer of the LLC. Wamego Store, LLC,

Organizing Documents, Ex. 5 - PBPN-000918–919 (May 28, 2024).

18.     In those applications, the applicant agreed to pay tobacco and sales taxes and to

provide certain sales and inventory reports to the Tax Commission. *Id*.

19.     In its business license application, the applicant agreed to "submit regular Sales Revenue reports, as requested by the PBPN Tax Commission Office" and agreed "to be bound by and comply with all laws of the Prairie Band Potawatomi Nation" and "consensually submit[ted] to the jurisdiction of the Prairie Band Potawatomi Nation." License for Bus. Appl., 1, Ex. 6 - PBPN-000092 (Jan. 26, 2024).

20.     In the Tobacco Retailer License application, the applicant agreed to: (i) Remit payment "to the Tax Commission for each Tribal Tax Stamp affixed on individual packs of cigarettes by the tenth (10th) of every month for the previous month"; (ii) "Submit all reports to the Tax Commission as required pursuant to the Potawatomi Law and Order Code Title 10 General Revenue and Taxation"; (iii) "Comply with all other applicable tribal business laws applicable to tribal tobacco retailers and wholesalers," and (iv) "Take all reasonable precautions to ensure the security and integrity of the Tribal Tax Stamp, including keeping unaffixed stamps in a secure location." Tobacco Retailer License Appl., 3, Ex. 7 - PBPN-000227–229 (Jan. 26, 2024).

21.     The applicant agreed "to be bound by and comply with all laws of the Prairie Band Potawatomi Nation" and "consensually submit[ted] to the jurisdiction of the Prairie Band Potawatomi Nation." *Id*.

22.     In the Liquor Retailer License Application, the applicant agreed to "be bound by and comply with all laws of the Prairie Band Potawatomi Nation" and "consensually submit[ted] to the jurisdiction of the Prairie Band Potawatomi Nation." Liquor Retailer License Appl., 1, Ex. 8 - PBPN-000232 (Jan. 26, 2024).

23.     The applicant also agreed "to comply with all of the terms and conditions of the Liquor Control Ordinance of the Prairie Band Potawatomi Nation and any other applicable law"

and "to be subject to the exclusive jurisdiction of the Prairie Band Nation Potawatomi Nation Tribal Court." *Id*.

24.     In the Tribal Motor Fuel Retailer License Application, the applicant agreed "to be bound by and comply with all laws of the Prairie Band Potawatomi Nation" and "consensually submit[ted] to the jurisdiction of the Prairie Band Potawatomi Nation." Motor Fuel License Retailer Appl., 1, Ex. 9 - PBPN-000230–31 (Jan. 26, 2024).

25.     The applicant agreed "to submit regular Motor Fuels Sales Revenue report[s] by the 10th of the following calendar month" and to keep all records "for 3 years and [make the records] readily available for PBPN Tax Commission inspection." *Id*. at 2.

26.     The State of Kansas has agreed that the Nation will regulate all sales of cigarettes within the Reservation. Compact Relating to Cigarette and Tobacco Sales, Taxation and Escrow Collection between the State of Kansas and the Prairie Band Potawatomi Nation, § 4.01(a), Ex. 10 -  PBPN-000010–29 (Feb. 17, 2016) ("Tobacco Compact").

27.     The Nation possesses civil-regulatory jurisdiction on its Reservation. Ex. 11 - Defendant's Response to Request for Admission No. 10.

28.     The Snak Atak Travel Plaza on the Reservation was subject to the civil regulations of the Prairie Band Potawatomi Nation. Ex. 11 - Defendant's Response to Request for Admission No. 3.

 *ii.* *Snak Atak's operation and failure to comply with Nation law*

29.     On or about January 30, 2024, the Tax Commission issued three licenses to Snak Atak Travel Plaza: a Business License (No. 013024-25) (effective date Jan. 30, 2024); a Tobacco Retailer License (License No. 1302024-4) (effective date Jan. 30, 2024); and a Motor Fuel License Retail (No. MOTOR-2024-03) (effective date Jan. 30, 2024). *See* Letter from Tonya

Negonsott-Rodvelt, Ex. 12 - PBPN-0000233–237 (Feb. 5, 2024); Email from Tonya Negonsott-Rodvelt, Ex. 13 - PBPN-000238 (Feb. 6, 2024).

30.     On February 1, 2024, the Nation's Tribal Council accepted the application for a liquor license, and, by resolution, approved the license. Tribal Council Resolution 2024-043 Approving Liquor License, Ex. 14 - PBPN-000619–20 (Feb. 1, 2024). On February 6, 2024, the Nation's Tax Commission issued the license to Snak Atak Travel Plaza. Liquor License 2024-01, Ex. 15 - PBPN-000236 (Feb. 6, 2024).

31.     On February 6, 2024, the Tax Commission informed Mishra (an owner of at least 5% of Snak Atak's parent company Wamego Stores, LLC and an organizer of Wamego Stores, LLC, Wamego Store, LLC, Organizing Document, Ex. 5 - (PBPN-000918–919)), via email that a business license, motor fuel retailer license, and tobacco retailer license had been approved with an effective date of January 30, 2024 and an expiration date of January 29, 2025. Email from Tonya Negonsott-Rodvelt, Ex. 13 - PBPN-000238 (Feb. 6, 2024).

32.     Also in that email, the Tax Commission informed Mr. Mishra that the liquor retailer license had been approved with an effective date of February 1, 2024, and an expiration date of January 31, 2026. *Id*.

33.     The email also reminded Mr. Mishra that "[u]pon acceptance of a license, the licensee consensually agrees to submit to the jurisdiction of the Prairie Band Potawatomi Nation (PBPN) and comply with all the PBPN Laws." *Id*.

34.     Snak Atak opened for business in or about March 2024.

35.     During its time in operation Snak Atak did not file required reports with the Tax Commission, affix Nation tobacco stamps to individual packs of cigarettes, or remit owed taxes

to the Tax Commission. PBPN Tax Commission Cease and Desist Order to Snak Atak, Ex. 16 -
PBPN-000100–03 (May 28, 2024).

     *iii.*     *The Nation's civil regulation of Snak Atak*

36.     On May 28, 2024, Nation Tax Commission staff Tonya Negonsott-Rodvelt and
William Mitchell visited Snak Atak to inspect its records and inventory. Negonsott-Rodvelt and
Mitchell were accompanied by Nation Police Officers Michael Barnhart and Dereck Martinez.
Law Enforcement Narrative from Chief Terry Clark, Ex. 17 - PBPN-000075–76 (May 28, 2024);
Law Enforcement Narrative from Michael Barnhart, Ex. 18 - PBPN-000077 (May 28, 2024);
Law Enforcement Narrative from Dereck Martinez, Ex. 19 - PBPN-000078 (May 28, 2024).

37.     During that visit, staff working at the Snak Atak refused to allow the Tax
Commission officials to inspect Snak Atak's records or inventory. Deputy Dereck Martinez Body
Cam Footage, Ex. 20 - PBPN-000731 (May 28, 2024).

38.     After being refused access for the inspection, the Nation officials left Snak Atak.
The Tax Commission officials then requested and obtained a cease-and-desist order from the Tax
Commission ("Cease and Desist Order"). Deputy Dereck Martinez Body Camera Footage, Ex.
20 - PBPN-000731 (May 28, 2024); PBPN Tax Commission, Cease and Desist Order to Snak
Atak, Ex. 16 - PBPN-000100–03 (May 28, 2024).

39.     The Cease and Desist Order states as follows:

     CEASE AND DESIST ORDER

     CHAPTER 13-3-1, POTAWATOMI NATION LAW AND ORDER
     CODE

     COMES NOW the Prairie Band Potawatomi Tax Commission (Tax
     Commission) and by the authority granted it by the Potawatomi Law
     and Order Code, has issued this **CEASE AND DESIST ORDER**
     upon the business known as Wamego Store, LLC d/b/a Snak Atak,
     doing business at 20330 US 75 N, Holton, Kansas.

For one or more of the following reported violations of the Potawatomi Law and Order Code, the Tax Commission has determined that this business continued noncompliance with the Potawatomi Law and Order Code and is a direct and immediate threat to the peace, safety, morals, or general welfare of the residents within the exterior boundaries of the Prairie Band Potawatomi Reservation as established on Article 4, of the Treaty with the Potawatomi Nation, dated June 17, 1846, 9 Stat. 853, and includes such other lands, islands, waters or any interest therein hereafter added to the Reservation.

Reported Violations:    1) Failure to allow Tax Commission and Tribal Police access to the premises to conduct inspections. *Chapter 10- 1-4, General Taxing Powers of the Tax Commission, Potawatomi Law and Order Code.*

2) Failure to conspicuously post licenses issued by the Nation. *Chapter 13-2-2, Application and Issuance, Potawatomi Law and Order Code.*

3) Failure to provide and remit sales tax owed the Nation and maintain sales tax records and filing applicable reports with the Tax Commission. *Chapter 10-3, Sales Tax, Potawatomi Law and Order Code.*

4) Failure to affix tribal tobacco stamps to tobacco products sold to the public within the store, maintain records and filing applicable reports with the Tax Commission, remitting tobacco excise tax to the Tax Commission. *Chapter 10-2, Tribal Tobacco Excise Tax, Potawatomi Law and Order Code.*

5) Continual non-compliance with the Nation's business licensing ordinance while conducting business in violation of the applicable conditions of licenses issued by the Nation. *Chapter 13-3, Sanctions, Potawatomi Law and Order Code.*

- 11 -

This order shall remain in effect until the Wamego Store, LLC d/b/a Snak Atak, doing business at 20330 US 75 N, Holton, Kansas, shall come into compliance with the Potawatomi Law and Order Code.

Wamego Store, LLC d/b/a Snak Atak, doing business at 20330 US 75 N, Holton, Kansas shall cease and desist business immediately upon service of this order and may file a notice of appeal with the Prairie Band Potawatomi Nation District Court within thirty (30) days from receipt of this **CEASE AND DESIST ORDER** in accordance with *Chapter 13-3-1 (B) Revocation of License; Failure to Obtain License; Show Cause Hearing, Potawatomi Law and Order Code.*

By issuing this order neither the Tax Commission nor the Prairie Band Potawatomi Nation waives any other remedy available under the Potawatomi Law and Order Code.

This **CEASE AND DESIST ORDER** is entered on this 28th_ day of May, 2024 and served on Wamego Store, LLC d/b/a Snak Atak, doing business at 20330 US 75 N, Holton, Kansas and its agent [illegible] on this 28th day of May, 2024 at the business address.

IT IS SO ORDERED

Cease and Desist Order, 1–2, Ex. 16 - PBPN-000100–03.

40.     Snak Atak did not appeal the Cease and Desist Order within thirty days.

*iv.     Defendant's actions at Snak Atak*

41.     Later in the day on May 28, 2024, Nation Tax Commission staff Tonya Negonsott-Rodvelt and William Mitchell returned to Snak Atak accompanied by Nation Police Chief Terry Clark and Nation Police Officers Michael Barnhart and Dereck Martinez to serve the Cease and Desist Order. Law Enforcement Narratives, Chief Terry Clark, Officer Michael Barnhart, and Officer Dereck Martinez, Exs. 17, 18, 19 - PBPN-000075–78 (May 28, 2024).

42.     Chief Clark called Sheriff Morse by cell phone. Chief Clark's side of the conversation was recorded on his body camera. Chief Terry Clark, Body Cam Footage at 2:09 to 8:47, Ex. 21 - PBPN-000737 (May 28, 2024).

43.     Chief Clark said to Sheriff Morse the following:

    a.   "Hello Sir, hey, you busy? We're getting ready to serve a cease and desist order on 'em."

    b.   "The Tribe issued them their business license. They're not in compliance. They've been trying to get in compliance, get them to get in compliance for the last six months. They're not paying -, they haven't paid—they haven't paid their taxes."

    c.   "… they're also selling lottery tickets here and they didn't have their alcohol license up, and I mean there's a lot of different reasons here."

    d.   "But (inaudible) my understanding is – I'm here just to keep the peace. But, my understanding is, they signed an agreement with the tribe."

    e.   "And the tax commission, you know, they, they brought up all these things, and, and they're ordering them to stop doing business."

    f.   "For what?"

    g.   "No. Nobody's asked us to leave."

    h.   "I'm not. I'm keeping the peace. I have an order signed by the Tax Commission that says cease and desist."

    i.   "Well, I mean the tribe issues the business license."

    j.   "They have to . . . because it's on the Reservation."

    k.   "Well, that's what they want to do."

    l.   "… I can't get in the middle of the taxation stuff like that but they have a cease and desist order."

*Id*. at 2:15 to 4:25; Law Enforcement Narrative from Chief Terry Clark on Snak Atak Call, 1, Ex. 17 - PBPN-000075–76 (May 28, 2024).

    44.    While Negonsott-Rodvelt, Mitchell, Chief Clark, Officer Barnhart, and Officer Martinez were at Snak Atak to serve the Cease and Desist Order, Jackson County Sheriff's Sgt. Bryce Whelpley, Deputy Jose Martinez, and Deputy Maverick Ohlde arrived at Snak Atak. Deputy Jose Martinez, Body Cam Footage at 0:00–1:00, Ex. 22 - MORSE_000027 (May 28, 2024).

45.     Nation Police Chief Terry Clark was on the phone with Sheriff Morse when two of the Jackson County Deputies, Deputy Martinez and Deputy Ohlde, arrived at the Snak Atak. Chief Terry Clark, Body Cam Footage at 7:30 to 7:36, Ex. 21 - PBPN-000737 (May 28, 2024).

46.     Also during that call, Chief Clark repeatedly advised the Sheriff that this was "a civil matter." *See*, *e.g.*, *id*. at 6:54; Law Enforcement Narrative from Chief Terry Clark on Snak Atak Call, 2, Ex. 17 - PBPN-000075–76 (May 28, 2024).

47.     Also during that call, Chief Clark told Sheriff Morse that Snak Atak employees, "have not said one word about us leaving. Never – have not asked. I've got Michael Barnhart and Dereck Martinez and all that out here." Chief Terry Clark, Body Cam Footage at 7:37 to 7:47, Ex. 21 - PBPN-000737 (May 28, 2024); Law Enforcement Narrative from Chief Terry Clark on Snak Atak Call, 2, Ex. 17 - PBPN-000075–76 (May 28, 2024).

48.     Also, during that call, Sheriff Morse told Chief Clark that if they are asked to leave that they should leave because theoretically they could be subject to arrest for criminal trespass and that Sheriff Morse didn't want to put his deputies or the Nation officials in that position. Law Enforcement Narrative from Chief Terry Clark on Snak Atak Call, 2, Ex. 17 - PBPN-000075–76 (May 28, 2024); Ex. 23 - MORSE_000002, Ex. 24 - PBPN-000288, Sheriff Morse email to Lee Hendricks (May 31, 2024); Ex. 25 - Defendant's Response to Interrogatory No. 8.

49.     After hanging up from his call with Sheriff Morse, Chief Clark said the following to Negonsott-Rodvelt and Mitchell:

    a.   "I will tell you guys right now that the Sheriff doesn't believe you can do this. Does not believe you can do this because this is a private business, you can't lock them out of a private business. It's all over tax stuff. I guess he's been complaining to the Sheriff about the tax commission and everything else. Chief Terry Clark, Body Cam Footage at 8:54 to 9:16. Ex. 21 - PBPN-000737 (May 28, 2024).

- 14 -

b. "Now I will tell you if they come in here and ask us to leave, I have no legal reason to stay." *Id.* at 9:16 to 9:28.

50.     The Snak Atak manager stated that the Sheriff "told me that if they are going to mess you a lot, just give us a call. We are going to send you dispatch in." Sgt. Bryce Whelpley, Body Cam Footage at 1:40–1:53, Ex. 26 - MORSE_000025 (May 28, 2024).

51.     The Nation Police and Tax Commission officials served the Cease and Desist Order on Snak Atak and left. *See* Deputy Dereck Martinez, Body Cam Footage at 41:30–47:39 , Ex. 27 - PBPN-000732 (May 28, 2024).

52.     The Sheriff's deputies remained on site until the Nation's officials left. Deputy Jose Martinez, Body Cam Footage at 28:00, Ex. 22 - MORSE_000027 (May 28, 2024).

53.     Sheriff Morse admitted that "on a telephone call between Sheriff Morse and Chief Terry Clark on May 28, 2024, Sheriff Morse told Chief Clark that if Snak Atak employees ask the Prairie Band officials to leave the premises and they do not leave, they could be subject to arrest by the Sheriff's Office."  Ex. 11 - Defendant's Response to Request for Admission No. 8.

54.     Sheriff Morse has stated that he told Chief Clark: "I explained that I thought if they didn't have the authority to proceed, that if they were asked to leave the property by the owners or management it could result in trespassing which could end in criminal charges or arrest."  Ex. 25 - Defendant's Response to Interrogatory No. 8.

55.     Sheriff Morse wrote an email to the then-Jackson County Counselor Lee Hendricks, on May 31, 2024, which read as follows:

> On that day, we had a couple calls from the store. At the end of the day the owner/manager called me very upset stating that they were there to close his store. At the same time, I received a call from Chief Clark who from what I understood was on the scene. I am guessing his purpose was to tell me that they were on scene. I believe our dispatch also received a call and three deputies were dispatched. The

- 15 -

Chief seemed to not be completely on board with what the tribe was doing either and made the point that they were only keeping the peace and there was nothing else they could legally do.

I was concerned that what was happening based on what the owner was telling me was illegal. I told the Chief that if they are asked to leave that they should leave because theoretically they could be subject to arrest. The Chief assured me that no one has asked them to leave. I told him that I didn't want his officers or my deputies in that situation. He told me that he told the taxing commission who planned to chain the doors shut to not do it. He said they were there only to serve a cease-and-desist notice and leave. We had a good visit after that and discussed his son's tonsil surgery. I was advised that everyone left with no incident. I have been told since that the store has not been open since.

Email from Lee Hendricks to Darren Root, Ex. 23 - MORSE_000002 (May 31, 2024); *see also*

Ex. 24 - PBPN-000288.

56.     On a body camera recording during the visit by Nation officials to serve the Cease

and Desist Order, Sgt. Bryce Whelpley stated on a phone call that "This is all civil, I don't know

what we can do about it." Sgt. Bryce Whelpley, Body Cam Footage at 5:30, Ex. 28 -

MORSE_000026 (May 28, 2024).

57.     Chief Clark told Sgt. Whelpley:

"They're serving a cease and desist order on this business because they're not meeting the regulatory, civil regulatory law of the Tribe. There was a plan of chaining the doors closed, doing all that stuff. Have one guy, I don't know him, we were up here earlier, the Tribe has the right to go in there and inspect for – Tribal – you know, tobacco, that stuff. They refused to allow -. And there's an agreement between the business owner and the tribe. All that stuff. So, I'm going to serve them, get them properly served on the cease and desist order. I'm gonna tell them, you've got to close your doors. Whatever they do at that point is up to them. As long as they're properly served, then we're leaving. It's paperwork. It's all civil. There's nothing criminal here. But we're here, us three are here just to keep the peace. They weren't very nice to Tonya and William when they came up here earlier to try and do their inspection."

*Id.* at 6:12 to 7:23.

CORE/0835793.0018/238354448.2

58.     Sgt. Whelpley asked Chief Clark and Negonsott-Rodvelt the ramifications if the Snak Atak continued to stay open. Both Chief Clark and Negonsott-Rodvelt said it would go back to the Tax Commission and through the courts. *Id*. at 9:12 to 9:22.

59.     Sgt. Whelpley stated on another call captured on his body camera "I'm not gonna be putting cuffs on other law enforcement officers out here at the moment." *Id*. at 13:46.

60.     Sgt. Whelpley told the manager of Snak Atak that "there's nothing criminal that I can take care of." *Id*. at 21:14.

61.     Sgt. Whelpley also told the manager of Snak Atak that there's "not much we can do, it's all on the civil side with them." *Id*. at 28:35.

62.     The Snak Atak closed in August 2024 and has not been open for business to the public since that date.

    *v.*     *Tribal court action*

63.     On or about June 28, 2024, the Tax Commission filed suit against Snak Atak and its agents in tribal court seeking an order of exclusion from the Reservation. The complaint requested that the Court:

> impose conditions in the order of exclusion including (1) an order directing all excluded parties to immediately cease and desist all commercial activity at the business location, (2) an order directing the Tax Commission and Tribal Police to use whatever reasonable and lawful means available to secure the business location, including but not limited to, chaining doors and placing barricades around the property to prevent access to the business location.

*Tax Comm'n v. Wamego Store LLC*, No. CV-2024-OT-0013-CV (Prairie Band Dist. Ct. filed June 28, 2024); Exclusion Complaint Form, Ex. 29 - PBPN-000630–32 (June 28, 2024).

64.     On or about June 30, 2024, the Tax Commission filed two actions against Snak Atak in tribal court, with the first seeking an injunction prohibiting Snak Atak from conducting business within the Reservation and an injunction prohibiting Snak Atak from interfering with

- 17 -

Tax Commission staff performing their official duties such as conducting inspections and seizing contraband, and the second seeking civil penalties for violations of the Nation's law. *Tax Comm'n v. Wamego Store LLC*, No. CV-2024-OT-0013.CV (Prairie Band Dist. Ct. filed June 30, 2024), PBPN-000817–32.

65.     Since that date, the Tribal Court entered an order of exclusion against Snak Atak, Ex. 30 - PBPN-00836–38 (Aug. 8, 2024), and entered a default judgment against the parent company for civil penalties, Ex. 31 - PBPN-00921–26 (Feb. 3, 2025). No tax payments or penalties have been recovered, but the Nation continues to pursue its remedies in Tribal Court.

## D.     The parking enforcement incident

66.     At approximately 8:00 a.m. on August 26, 2021, Jackson County Sheriff's Deputy Kendal Grimm found a 2003 Toyota Avalon registered to Kenneth Aitkens parked in the roadway on O Road. Aitkens was a tribal employee at a hemp production facility within the Reservation. Deputy Grimm believed Aitkens' vehicle was a road hazard as it was over a crest of the hill and asked Aitkens to park the vehicle on the shoulder and off the roadway. Aitkens refused to move the vehicle. Deputy Grimm told Aitkens he would have the vehicle towed if Aitkens did not move the vehicle. Deputy Grimm requested assistance and Sgt. Matthew Honas was dispatched to the location. After Sgt. Honas was in route and after Aitkens had called someone, Aitkens elected to move his vehicle. Deputy Grimm cleared the scene at about 8:16 a.m. Sheriff Tim Morse to Chief Terry Clark, Ex. 32 - PBPN-000187 (Sept. 1, 2021); JCSO – Call History Synopsis, Ex. 33 - MORSE_000029-000032 (Aug. 26, 2021).

67.     Aitkens is a tribal member and had tribal tags on his car. Kenneth Aikens, Certificate of Degree of Indian Blood, Ex. 34 - PBPN-000808 (Sept. 10, 2025); Kenneth Aikens, Prairie Band Potawatomi Nation, Titles and Registration, Ex. 35 - PBPN-000809 (Oct. 15, 2021).

68.    In response to this incident, on September 1, 2021, Sheriff Morse stated in an email to Chief Clark that "unless the road is completely shut down, all Kansas statutes still apply." Email from Sheriff Tim Morse to Chief Terry Clark, Ex. 32 - PBPN-000187 (Sept. 1, 2021).

## ADDITIONAL MATERIAL FACTS ("AMF")

### A.    Additional background

69.    The Nation's laws and regulations governing alcohol, tobacco, and motor fuel sales were intended to protect Nation members and the Reservation community from the harms of such products by, for example, limiting alcohol and tobacco sales to minors. Code, §§ 15-5-38, 15-5-67.

70.    At no time did Snak Atak file any claim against the Nation to attempt to avoid the Nation's civil-regulatory jurisdiction. Exclusion Complaint Form, Ex. 29 - PBPN-000630–32 (June 28, 2024).

### B.    Additional facts regarding the Snak Atak incident

71.    Prior to May 28, 2024, the Nation's Tax Commission officials visited Snak Atak several times to conduct inspections, but the Snak Atak managers would not let them perform inspections, with one exception when they were allowed to inspect tobacco products. Ex. 36 - Negonsott-Rodvelt Dep. 70:12–71:21 (Dec. 9, 2025). The Tax Commission officials observed that Snak Atak was selling lottery tickets, alcohol, tobacco (without Nation tax stamps), and motor fuels without displaying its Nation licenses. *Id*. at 32:18–33:2–18.

72.    Weeks before the May 28, 2024 visit to Snak Atak by Nation officials, Tim Lenz, a friend of Sheriff Morse who knew the Snak Atak principals, contacted Sheriff Morse and asked him to get in touch with Amit Mishra because the Nation was harassing Snak Atak. Lenz wanted

the Sheriff to intervene on behalf of the Snak Atak owners against the Nation. In the weeks leading up to the Snak Atak incident, Sheriff Morse spoke with Mishra several times about the Nation's officials visiting Snak Atak, including at least once in person (at Snak Atak). Mishra told the Sheriff that he had never signed anything for the Nation, and the Sheriff believed him. Ex. 37 - Morse Dep. 14:08–15:05, 17:02–19:14, 20:03–11, 21:01–17 (Dec. 10, 2025).

73.    On the morning of May 28, 2024, Mishra forwarded a message from the Tax Commission to Sheriff Morse which explained that the Nation would be visiting Snak Atak to conduct an inspection on that date. The Sheriff advised Mishra via text message that Snak Atak "pays taxes to the state", that "[t]his is not tribal property", and to "ask them [the Nation officials] to leave". Text Messages between Sheriff Tim Morse and Amit Mishra (May 28, 2024), Ex. 38 - MORSE_0000365–39. Ex. 37 - Morse Dep. 29:13–30:05 (Dec. 10, 2025).

74.    The Sheriff did not tell Chief Clark (or anyone else) that he had told Mishra to ask the Nation officials to leave. Text Messages between Sheriff Tim Morse and Amit Mishra (May 28, 2024), Ex. 38 - MORSE_0000365–39. Ex. 37 - Morse Dep. 29:13–30:05 (Dec. 10, 2025).

75.    Approximately a week before the May 28, 2024 Snak Atak incident, a Jackson County Sheriff's Office dispatcher, Bethany Streeter, was told by one of her supervisors that if the Snak Atak owner called to say that Nation officials were onsite, she was to dispatch "two or three deputies" to "back him up in whatever way was necessary."  Ex. 39 - Streeter Dep. 13:09–14:20; 23:05–24:03, 32:19–25 (Dec. 9, 2025).

76.    There was talk about Snak Atak and the Nation's regulation of Snak Atak throughout the week leading up to the Snak Atak incident in the Jackson County Sheriff's Office dispatchers' office. *Id*. at 40:01–8.

CORE/0835793.0018/238354448.2

77.     On May 28, 2024, at 5:46 p.m., Streeter received a call from a Snak Atak manager, Raja Rain, who told her that "tribal pd employees are saying they won't leave." JCSO Call History Synopsis (May 28, 2024), Ex. 40 - MORSE_000009.

78.     Streeter and her colleague immediately dispatched Deputy Ohlde, Deputy Martinez, and Sergeant Whelpley, to Snak Atak. *Id*. The officers showed up in three separate patrol cars, stood around armed during the Nation's visit, and did not leave until after the Nation's officials served the Cease and Desist Order on Snak Atak and left. Photograph of Sheriff's Vehicles in Snak Atak Lot, Ex. 41 - PBPN-0000740 (May 28, 2024); Whelpley, Body Cam Footage 26:00–29:00 Ex. 28 - MORSE_000026.

79.     Streeter also called a Sheriff's Deputy about the Nation's officials being at Snak Atak and said: "Anyways, it's tribal PD out there and we were told by Tim *to arrest them* if they refuse to leave." JCSO Dispatch Audio File, 0:41–0:49 (May 28, 2024), Ex. 42 - MORSE_000017 (emphasis added); JCSO Call History Synopsis, (May 28, 2024), Ex. 39 - MORSE_000009; Ex. 38 - Streeter Dep. 35:01–6, 36:02–23. "Tim" in Streeter's statement, is a reference to the Defendant Sheriff Tim Morse. *Id*. at 42:07–08. "Tribal PD" in Streeter's statement is a reference to the Nation's police officers who were onsite at Snak Atak. *Id*. at 20:18–22; 30:16–31:03; 47:08–12.

80.     Streeter understood from her conversations with her supervisor in the week preceding the Snak Atak incident that the Nation's police officers could be arrested for criminal trespass at Snak Atak and that the Sheriff wanted them to be arrested. *Id*. at 29:14–20; 30:09–15, 32:19–25; 36:10–23; 37:16–38:02; 38:16–19, 39:06–14, 42:01–20, 43:11–19.

81.     Prairie Band Police Chief Terry Clark felt "upset" and "very concerned" about three Sheriff's officers arriving at Snak Atak during the Nation's visit and he felt like it was a

possibility that the Sheriff' officers could arrest Nation officials. Ex. 43 - Clark Dep. 80:05–80:20, 81:23–82:18, 83:24–84:24 (Dec. 10, 2025).

82.    Before the second visit to Snak Atak on May 28, 2024, the Tax Commission had directed the tax officials who would be visiting Snak Atak with the Cease and Desist Order to have Chief Clark "close the business" and "lock up the doors with the chains". Ex. 44 - Negonsott-Rodvelt Dep. 47:21–25, 49:01–9 (Dec. 9, 2025). Chief Clark initially planned to eject the Snak Atak employees. Clark, Body Cam Footage at 0:00–0:06, Ex. 21 – PBPN-000737 (May 28, 2024) ("You're gonna have to leave").

83.    During this visit to Snak Atak to serve the Cease and Desist Order, Nation Police Officer Dereck Martinez had the locks and chains for chaining the doors in his truck. Martinez, Body Cam Footage at 46:28–46:47, Ex. 27 – PBPN-000732 (May 28, 2024).

84.    After the Sheriff's interference and threats of arrest, Chief Clark told the Tax Commission officers onsite that "we're not gonna chain [the doors] shut", Clark, Body Cam Footage at 18:54–18:56, Ex. 21 - PBPN-000737 (May 28, 2024), and that "I'm not gonna get into a fight with these guys either because they are already threatening to uh if they ask us to leave and we don't leave *to arrest us*." *Id*. at 19:54–19:59 (emphasis added). Tax Director Negonsott-Rodvelt replied, "yeah, I don't need to be arrested." *Id*. at 20:00–20:02.

85.    Chief Clark made the decision not to chain the doors. Ex. 45 - Negonsott-Rodvelt Dep. 49:17–50:02. He told Sgt. Whelpley the Nation has authority to chain the doors, but that he was not going "to get into a quip up here" with the Sheriff's Office. Whelpley Body Cam Footage, at 9:22–9:53 Ex. 28, MORSE-000026.

CORE/0835793.0018/238354448.2

86.     When he became a Nation Police Officer, Sheriff Morse took an oath "to defend, enforce and obey" the Nation's constitution and laws. Prairie Band Potawatomi Nation Police Department Oath of Office, Tim Morse (Nov. 18, 1999), Ex. 46 - PBPN-000401.

## C.     Additional Facts regarding the O Road incident

87.     When Deputy Grimm found Aitkens' parked car on August 26, 2021, it was parked within the Reservation.  Ex. 37 - Morse Dep. 8:23–9:04 (Dec. 10, 2025).

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he inquiry for the court is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Biester v. Midwest Health Services, Inc*., 77 F.3d 1264, 1266 (10th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to the facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material fact. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (internal citations and quotations omitted)

## ARGUMENTS & AUTHORITIES

### I.    Sheriff Morse unlawfully interfered with the Nation's exercise of its civil-regulatory jurisdiction at Snak Atak.

There is no question that the Nation had civil-regulatory jurisdiction over Snak Atak.

Even the Sheriff admits it. (SMF ¶¶ 27–29). The only question is whether the Sheriff's

interference with the Nation's exercise of civil-regulatory jurisdiction over Snak Atak infringed

on the Nation's rights under federal law. The Sheriff's interference included:

- Sending three armed deputies in three patrol cars to Snak Atak for the duration of the Nation officials' visit while those officials were exercising the Nation's civil-regulatory jurisdiction and serving a Cease and Desist Order on Snak Atak (SMF ¶¶ 44, 45, 52; AMF ¶ 77);

- Advising Mishra to ask Nation officials to leave so that if they refused to leave he could arrest them for criminal trespass—even though they had every right to be at Snak Atak exercising the Nation's civil-regulatory jurisdiction (SMF ¶¶ 27–28, 48, 53–55; AMF ¶¶ 72–79); and

- Telling the Nation's Police Chief while he was onsite at Snak Atak to assist the Tax Commission that the Nation officials could be arrested for criminal trespass if the Snak Atak employees asked them to leave and they did not leave, without disclosing to Chief Clark that he—the Sheriff—had directly advised Snak Atak's owner to ask the Nation officials to leave. (SMF ¶¶ 48, 53–55; AMF ¶ 73).

There is also no question that Sheriff Morse was fully prepared to arrest the Nation

officials for criminal trespass if the Snak Atak employees asked them to leave and they did not

leave. He advised Snak Atak's owner to ask the Nation officials to leave to create a reason to

arrest the Nation officials. In other words, asking the Nation officials to leave—which the Sheriff

identified as a basis for criminal trespass if the Nation officials refused to leave—*was the*

*Sheriff's idea* and part of a pre-conceived plan. (AMF ¶ 73). The issue of stopping the Nation

from exercising its civil-regulatory jurisdiction at Snak Atak had been discussed in the Sheriff's

Office for at least a week preceding the Nation's May 28, 2024 visit. (AMF ¶¶ 74, 75, 79). The

discussions affected Sheriff's Office dispatcher Streeter enough that she directly said to a deputy

on May 28, 2024, that Sheriff Morse "wants us to arrest" the Nation's police officers at Snak Atak. (AMF ¶¶ 74, 78, 79).

Under federal common law, Indian tribes possess civil-regulatory jurisdiction over non-Indians on their reservations who enter into a consensual relationship with the tribe or whose actions threaten or have some direct effect on the tribe's political integrity, economic security, health or welfare. *Montana v. United States*, 450 U.S. 544, 565–66 (1981). In this case, Snak Atak, a non-Indian owned convenience store located on fee land within the Nation's Reservation, consented in writing to the Nation's regulation. Its consent extended to liquor sales, motor fuel sales, tobacco sales, general business conduct, and taxation. (SMF ¶¶ 16–33).

Apart from the *Montana* test for tribal jurisdiction, federal law delegates regulation of liquor sales on the Reservation to the Nation and the State of Kansas. Anyone selling liquor on the Reservation must comply with *both* state and tribal law. *United States v. Mazurie*, 419 U.S. 544 (1975); 18 U.S.C. § 1161. And the Tobacco Compact between the State of Kansas and the Nation recognizes *that the Nation regulates all tobacco sales on the Reservation*. *See* Tobacco Compact § 4.01(a) (Feb. 17, 2016). Thus, Snak Atak was subject to the Nation's regulation of liquor sales and tobacco sales at the very least—even without any written consent. And the Sheriff, as the Chief law enforcement officer in the County—and a previous Nation police officer—should have been aware of those facts. (SMF ¶ 15, 26; AMF ¶¶ 69, 85).

Indeed, as a former Nation police officer, Sheriff Morse was familiar with the Nation's constitution and laws. (SMF ¶ 7; AMF ¶ 85). He should have known that the Nation can regulate liquor and tobacco sales without any express consent from the retailer. He also could have called the Nation's Police Department or Tax Commission at any time to find out that Snak Atak *had consented* in writing to the Nation's civil-regulatory jurisdiction. Instead, he relied solely on the

Snak Atak owner's (false) statements to him that Snak Atak had never consented to any Nation jurisdiction. (AMF ¶ 72).

Based on his friend's, Tim Lenz's, request for Sheriff Morse to help Snak Atak in its dispute with the Nation, Sheriff Morse visited with Mishra during an onsite visit to the Snak Atak, and over the phone and via text messages, in the days and weeks leading up to the May 28, 2024 Snak Atak incident. (AMF ¶¶ 72–73). Mishra supposedly told Sheriff Morse, untruthfully, that Snak Atak had not signed an agreement of any sort with the Nation, and Sheriff Morse claims to have incorrectly understood this to mean that the Nation had no civil-regulatory jurisdiction over Snak Atak. Sheriff Morse told Mishra that Snak Atak was not on tribal property and that Mishra should ask the Nation officials to leave when they visit Snak Atak. (AMF ¶¶ 72–73). The Sheriff never should have acted without first checking and verifying the facts.

Around the Jackson County Sheriff's Office, the Sheriff had conversations about what he wanted to do to protect Snak Atak from the Nation. These conversations circulated through the office and left the impression with at least one dispatcher that Sheriff Morse wanted the tribal officials to be arrested when they visited Snak Atak on May 28, 2024. This dispatcher, Bethany Streeter, said on a dispatch call to a deputy on May 28, 2024, "Anyways, its tribal PD out there [at Snak Atak], and we were told by Tim [Sheriff Morse] to arrest them if they refused to leave." (AMF ¶¶ 75, 78–79).

Sheriff Morse was convinced—incorrectly and without checking details or consulting counsel—that the Nation lacked civil-regulatory jurisdiction over Snak Atak, and he believed he could stop the Nation's officials from even visiting Snak Atak by threatening to arrest them for criminal trespass once a Snak Atak manager or employee asked them to leave and they did not leave. Sheriff Morse even set this plan in motion by telling Mishra to "ask them to leave" when

the Nation officials came to Snak Atak. (AMF ¶ 73). However, no one from Snak Atak asked the

Nation's officials to leave during either of the Nation's officials' two visits to Snak Atak on May

28, 2024. (SMF ¶¶ 43, 47).

Despite expressly consenting to the Nation's civil-regulatory jurisdiction, when the

Nation's Tax Commission officials visited Snak Atak to inspect tax stamps on tobacco products,

for example, Snak Atak routinely denied them access. (SMF ¶¶ 16–25, 35; AMF ¶ 71). The final

time this occurred, on May 28, 2024, the Nation's Tax Commission officials, together with

Nation law enforcement officers (who were present to assist the Tax Commission officials in

their civil regulation of Snak Atak) left Snak Atak, went to the Tax Commission, and obtained a

Cease and Desist Order directing Snak Atak to cease its operations and providing Snak Atak

with an appeal process. The Tax Commission officials, also on May 28, 2024, went back to Snak

Atak (with Chief Clark and two other Nation police officers)[2] to serve the Cease and Desist

Order and to chain the doors shut so that Snak Atak could not continue operations in violation of

the Cease and Desist Order. (SMF ¶¶ 36–39, 41, 51; AMF ¶¶ 81, 82).

During this visit, the Sheriff dispatched three Sheriff's deputies from the Jackson County

Sheriff's Office to Snak Atak. Each of the three arrived in a separate marked patrol car. (SMF

¶¶ 44–45; AMF ¶ 77). The deputies stayed on the scene the entire time the Nation's officials

were present. (SMF ¶ 52; AMF ¶ 77). Chief Clark called Sheriff Morse to explain that the

Nation's officials were at Snak Atak to serve a Cease and Desist Order, which was a civil-

---

[2] To be clear, while Chief Clark and two other Nation police department officers were on the scene at Snak Atak, they were only there on a civil stand-by basis to keep the peace and to support the Nation's Tax Commission officials' service of the Cease and Desist Order. The Nation's police department was not exercising criminal jurisdiction over Snak Atak or anyone at Snak Atak during this visit, and there is no evidence that proves otherwise. (SMF ¶¶ 43, 55, 57).

regulatory process. (SMF ¶¶ 42–43).

Yet the Sheriff told Chief Clark that if Snak Atak asked them to leave and they did not leave, they could be arrested for criminal trespass. Rather than escalating the situation into a standoff between two law enforcement agencies, Chief Clark served the Cease and Desist Order on Snak Atak and the Nation's officials left. (SMF ¶ 51). Chief Clark told the Tax Commission officials not to chain Snak Atak's doors in a wise and reasonable effort to deescalate the situation and ensure that no arrests were made despite the Sheriff's threat. (AMF ¶¶ 83–84). Rather than forcing a confrontation, Chief Clark exercised mature judgment in deescalating the situation. The Sheriff's argument that there was not any threat of arrest at that time is belied by the facts—even an objective observer would have concluded that the Nation officials should leave. Merely the presence of multiple police officers and patrol cars can communicate a threat of arrest. *See*, *e.g.*, *People v. Ganaway*, 568 P.3d 780, 787 (Colo. 2025) ("The presence of more than one officer can increase the coerciveness of the interaction.").[3]

---

[3] Seargeant Whelpley's discussion with Chief Clark regarding what the Nation officials were doing onsite comes needlessly close to meeting the test of an unlawful *Terry* stop because the Sheriff lacked any reasonable, articulable suspicion that the Nation officials were engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21 (1968) ("And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."); *see also Commonwealth v. Wright*, 672 A.2d 826, 830 (1996) ("This standard is met if the police officers' reasonable and articulable belief that criminal activity was afoot is linked with their observations of suspicious or irregular behavior on behalf of the particular defendant stopped.") (cleaned up). The Sheriff (and, therefore, Whelpley) reasonably should have known that Nation officials had civil-regulatory jurisdiction over Snak Atak regardless of what he was told by Mishra (falsely) about Snak Atak not agreeing to the Nation's exercise of such jurisdiction. The Nation's civil-regulatory jurisdiction includes the right to inspect Snak Atak's premises even if Snak Atak's owners ask the Nation officials to leave. *See*, *e.g.*, Code § 10-2-9 ("The Tax Commission may inspect said records at any time to determine whether sufficient tribal tobacco stamps have been purchased to account for all cigarettes received and sold or otherwise disposed of by said tribal distributor or retailer."); Tobacco Compact, § 4.01(a), Ex. 10 - PBPN-000016–17 (Feb. 17, 2016) (recognizing that Kansas has agreed that the Nation regulates all sales of cigarettes within the Reservation.).

When Chief Clark told Sheriff Morse on their phone call that Snak Atak had obtained a business license from the Nation, it seemed to make no difference to the Sheriff. (SMF ¶¶ 16, 19, 29, 42–43). Importantly, Chief Clark immediately told Sheriff Morse at the very beginning of the call that the Tribe had issued Snak Atak a business license. (SMF ¶¶ 42–43). Even after learning that fact, Sheriff Morse insisted that if Snak Atak asked the Nation officials to leave and they did not leave they could be arrested for criminal trespass.[4]

This concept flies in the face of federal Indian law, which recognizes the Nation's civil-regulatory jurisdiction over Snak Atak and does not allow the Sheriff to arrest (or threaten to arrest) Nation officials engaged in their official civil-regulatory duties at Snak Atak. *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 332 (1983) ("[A]bsent governing Acts of Congress, a State *may not* act in a manner that *infringe[s]* on the right of reservation Indians to make their own laws and be ruled by them.") (internal citations and quotations omitted) (emphases added); *McClanahan*, 411 U.S. at 173 (same; "When the relevant treaty and statutes are read with this tradition of sovereignty in mind, we think it clear that Arizona has *exceeded its lawful authority* by attempting to tax appellant.") (emphases added); *Fisher v. Dist. Ct. of Sixteenth Jud. Dist. of Montana*, 424 U.S. 382, 387 (1976) ("State-court jurisdiction plainly would *interfere with the powers of self-government* conferred upon the Northern Cheyenne Tribe and exercised through the Tribal Court.") (emphasis added); *Williams v. Lee*, 358 U.S. 217, 223 (1959) ("There can be no doubt that to allow the exercise of state jurisdiction here would undermine the authority of the tribal courts over Reservation affairs and hence *would infringe on the right of the Indians to govern themselves*.") (emphasis added).

---

[4] Again, Sheriff Morse did not disclose to Chief Clark at this time or at any other time that he—Sheriff Morse—had directly told Snak Atak's owner to ask the Nation officials to leave to create a basis for him to arrest the Nation officials for criminal trespass. (SMF ¶¶ 42–43; AMF ¶ 73).

After Sheriff Morse told Chief Clark that the Nation officials could be arrested for criminal trespass if they were asked to leave and did not leave—and considering the show of force made by the Sheriff's Office at Snak Atak—the Nation officials were rightfully concerned about the situation escalating into them being arrested for criminal trespass or worse. The Nation officials, therefore, decided to serve the Cease and Desist Order and leave without ejecting the employees or chaining the doors. But the Sheriff's threat still interfered with the Nation's exercise of its civil-regulatory jurisdiction. If a local or state law enforcement officer can arrest or intimidate tribal officials engaged in the lawful exercise of civil-regulatory jurisdiction by threats or a show of force as happened here, then tribal civil-regulatory jurisdiction does not exist in any meaningful sense. The fact that no arrests were made is irrelevant.

Threatening to arrest Nation officials engaged in the legitimate exercise of civil-regulatory jurisdiction for criminal trespass constitutes an unlawful interference with, or infringement on, the Nation's jurisdiction. The Supreme Court has explained that "[s]tate jurisdiction is preempted by the operation of federal law if it *interferes* or is incompatible *with* federal and tribal interests reflected in federal law, unless the State interests at stake are sufficient to justify the assertion of State authority." *Mescalero Apache Tribe*, 462 U.S. at 334. Here, the Sheriff has no interest in arresting or threatening to arrest Nation officials exercising the Nation's civil-regulatory jurisdiction on the Reservation. And even if the Sheriff could articulate some state interest in doing so, it cannot be sufficient to justify allowing the Sheriff to arrest or threaten to arrest Nation officials engaged in the exercise of lawful civil-regulatory jurisdiction. Allowing the Sheriff to do so would effectively nullify any right the Nation has to exercise civil-regulatory jurisdiction on its own Reservation. *See*, *e.g.*, *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142 (1980) ("Congress has broad power to regulate tribal affairs under

CORE/0835793.0018/238354448.2

the Indian Commerce Clause, Art. 1, § 8, cl. 3. This congressional authority and the semi-independent position of Indian tribes have given rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members. First, the exercise of such authority may be pre-empted by federal law. Second, it may unlawfully infringe on the right of reservation Indians to make their own laws and be ruled by them.") (cleaned up); *McClanahan*, 411 U.S. at 171–72 "Essentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them.") (internal citations omitted); *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Lawrence*, 22 F.4th 892, 1005 (10th Cir. 2022). ("The Tenth Circuit has repeatedly stated that . . . an invasion of tribal sovereignty can constitute irreparable injury.") (quotation omitted); *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1242, 1251 (10th Cir. 2001) (finding irreparable harm because "harm to tribal self-government [is] not easily subject to valuation but also, and perhaps more important, monetary relief might not be available to the tribe because of the state's sovereign immunity").

## II.    Sheriff Morse lacks authority to enforce Kansas' civil-regulatory parking and towing statutes, Kan. Stat. Ann. §§ 8-1569 and 8-1570, against Nation members on the Reservation.

### A.    *The Sheriff threatened to tow a Nation member's tribally tagged car.*

On August 26, 2021, Sheriff's Deputy Kendal Grimm told Nation member Kenneth Aitkens that if he did not move his car from the side of the road, the Deputy would have it towed.[5] The car was parked on O Road on the Reservation near the Nation's hemp processing facility. Aitkens' car had a Prairie Band license plate. The Kansas statute authorizing the Sheriff

---

[5] The Sheriff is responsible for the actions of his deputies. *Bd. of Cnty. Comm'rs of Cnty. of Lincoln v. Nielander,* 275 Kan. 257, 261–62, 62 P.3d 247, 251 (2003) ("The undersheriff and the sheriff's deputies and assistants are subordinates of the office of sheriff.").

to tow cars is not a criminal statute. It is a civil-regulatory statute. (SMF ¶ 66–68; AMF ¶ 86).

B.   *The Kansas laws regarding parking and towing cars do not apply within the Reservation.*

The Kansas Supreme Court has previously explained that certain State traffic laws do not apply within the Reservation because they rely on the phrases "within this state" and "in this state" to describe their geographical application. "[T]he phrases 'within this state' and 'in this state' were not meant to include the operation of vehicles on Native American reservations . . . ." *Rodewald v. Kansas Dep't of Revenue*, 297 P.3d 281, 290 (2013). The phrases "within this state" or "in this state" "would not include the roadways—either public or private—within the Nation's reservation over which its tribal police have assumed jurisdiction to enforce tribal law." *Id.* 291. *See also Pierce*, 253 F.3d at 1242, 1250 (stating that interference with the Nation's motor vehicle registration system threatened to interfere with tribal self-government and constituted irreparable injury).

*Rodewald* and *Pierce* suggest that the State statutes used by the Sheriff to threaten to tow Aitkens' car, Kan. Stat. Ann. § 8-1569 and 8-1570, do not authorize him to do so within the Reservation because the statute that purports to give him such authority, Kan. Stat. Ann. § 8-303, also includes the phrase "in this state."[6] (emphasis added). *Rodewald* interpreted that exact phrase in the same Chapter of the Kansas Statutes to mean *outside* the boundaries of the Reservation. Applying *Rodewald* and *Pierce* here, Sections 8-303, 8-1501, 8-1569 and 8-1570 do not authorize the Sheriff to tow (or threaten to tow) a tribally tagged vehicle owned by a Nation member and located on the Reservation.[7]

---

[6] *Id.* ("It is hereby made the duty of every sheriff, deputy sheriff, and every and all other law-enforcement officers of any county, city or township *in this state* to enforce the provisions of this act.") (emphasis added).

[7] In *Rodewald*, the Court explained there is no need for the State to have jurisdiction over roads within the Reservation. "[T]he Nation has the authority to enforce tribal law on the roadways

C.   *The Kansas laws regarding parking and towing cars are civil-regulatory—not criminal.*

The Kansas statutes on which the Sheriff would rely to threaten to tow Aitkens' car for illegal parking are a part of Chapter 8, Article 15 titled "Stopping, Standing and Parking". Kan. Stat. Ann. § 8-1569–1572. Specifically, Section 8-1570 purports to authorize the Sheriff to move any vehicle for a violation of Section 8-1569, which prohibits parking the vehicle too near the roadway—the reason for threatening to tow Aitken's vehicle given by the Sheriff. (SMF ¶ 66). In response to Chief Clark's questions about this incident, the Sheriff responded "unless the road is completely shut down, all Kansas statutes still apply." (SMF ¶ 68). The Sheriff is wrong as a matter of law.

In addition to Sections 8-1569 and 8-1570 not applying to the Reservation under Kansas law itself (as discussed above), they cannot be enforced against a Nation member or his tribally tagged vehicle on the Reservation because they are civil-regulatory—not criminal—in nature. The Kansas Judicial Council identifies the underlying statute, Section 8-1569, as civil in nature in its Pattern Jury Instructions. Pattern Inst. Kan. Civil 121.48 (March 2023 Update). The Kansas Judicial Council similarly identifies other parking or stopping laws as civil. Pattern Inst. Kan. Civil 121.49 (Kan. Stat. § 8-1571); *id.* at 121.50 (Kan. Stat. § 8-1572). For a violation of the parking statutes, Kan. Stat. §§ 8-1569, 1571, and 1572, the penalty is a $45 fine. Kan Stat. § 8-2118(c). The Kansas Court of Appeals, while calling traffic infractions a category of crime, also noted that traffic infractions are *not* felonies or misdemeanors. *State v. Jefferson*, 1991 WL 12018405, *3 (Kan. Ct. App. Mar. 15, 1991) (unpublished). No incarceration is possible for violations of these statutes alone.

---

within its reservation, publicly maintained or otherwise. KDR's jurisdiction over highways does not extend beyond those highways which are situated within this state, *i.e.,* those highways over which a Kansas law enforcement officer would have jurisdiction." *Rodewald*, 297 P.3d at 289.

Section 8-1570 authorizes the Sheriff to remove an improperly parked vehicle, but this statute is plainly civil-regulatory in nature because no crime attaches to the moving of the vehicle. The Kansas Court of Appeals identified traffic crimes as those listed in Kan. Stat. § 8-2118(c). *Id.* at *3 ("Rather, a traffic infraction is a separate category of crime defined as a violation of any of the statutory provisions listed in" Kan. Stat. § 8-2118(c)) (unpublished). But the vehicle removal statute under which the Sheriff threatened to move Aitkens' car, Kan. Stat. § 8-1570, is not listed in Kan. Stat. § 8-2118. It, therefore, cannot be criminal in nature and must be civil-regulatory.

Under *Cabazon*, however, it does not matter if the State characterizes a statute as criminal. An analysis must be performed to determine whether a statute is truly criminal (prohibitory) or civil (regulatory). *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 211 (1987) ("that an otherwise regulatory law is enforceable by criminal as well as civil means does not necessarily convert it into a criminal law"). In *Cabazon*, the state made gambling a crime but simultaneously allowed bingo to be conducted in certain circumstances. *Id*. The Supreme Court recognized that the law prohibiting gambling was not truly criminal when applied to bingo because state law *authorized* regulated bingo. Additionally, the Court found that the federal government had only given the state criminal—not civil-regulatory—jurisdiction. Because the state lacked civil-regulatory jurisdiction over the tribe's reservation, it could not enforce its bingo prohibition against the tribe or regulate the tribe's bingo operations.

Applying *Cabazon* here, the lack of any incarceration being available for a violation of Sections 8-1569 or 8-1570, the Court of Appeals statement that traffic violations are not felonies

or misdemeanors, and the fact that other Kansas statutes[8] expressly authorize parking on the side

of a roadway in certain circumstances demonstrates that those laws are civil-regulatory in nature.

D.    *Kansas has never acquired civil-regulatory jurisdiction over the Reservation.*

In *Rodewald*, the state conceded that Kansas has not acquired civil-adjudicatory

jurisdiction over Nation members on the Reservation. "KDR concedes that Kansas is not a P.L.

280 state and *has not been granted civil jurisdiction over causes of action* involving tribal

members on their reservation" *Rodewald*, 297 P.3d at 290; *see also Kickapoo Tribe v.*

*Shoemaker*, No. 00-4059-SAC, Decl. J. and Perm. Inj., 3 (D. Kan. filed Feb. 9, 2000) (Crow, J.)

(attached as Ex. 47) (stipulated holding that the Brown County Sheriff lacks jurisdiction to serve

civil process on the tribe's reservation). Yet, here, the Sheriff claims he has civil-regulatory

jurisdiction over the Reservation despite Kansas never having taken the necessary steps under 25

U.S.C. § 1322(a), which authorizes Kansas to acquire civil-adjudicatory and civil-regulatory

jurisdiction over Indians in the Reservation, but *only if the tribe consents*. Courts have found that

without following Section 1322, states cannot acquire civil jurisdiction over a reservation.

*McClanahan*, 411 U.S. at 178 "[W]e cannot believe that Congress would have required the

consent of the Indians affected . . . if the States were free to accomplish the same goal

unilaterally by simple legislative enactment."); *Kennerly v. Dist. Ct. of Ninth Jud. Dist. of Mont.*,

400 U.S. 423, 429 (1971) (Section 1322(a) "authorizes States to assert civil . . . jurisdiction in

Indian country *only after acquiring the consent of the tribes*") (internal quotations omitted)

---

[8] For instance, Kan. Stat. Ann. § 8-1569(b) allows otherwise prohibited parking where the vehicle is disabled. Kan. Stat. Ann. § 8-1571 allows otherwise prohibited parking in subsection 2 "momentarily to pick up or discharge a passenger or passengers" and in subsection 3 "temporarily for the purpose of and while actually engaged in loading or unloading property or passengers," and § 8-1572(b) allows local ordinances to permit otherwise unlawful parking. Kan. Stat. Ann. § 8-1524(g) and (h) allow stopping and parking vehicles on divided highways in certain circumstances.

(emphasis added); *Annis v. Dewey Cnty. Bank*, 335 F. Supp. 133, 136 (D.S.D. 1971) ("As noted earlier, only strict compliance with [25 U.S.C. §§ 1322 and 1326], can grant jurisdiction to the states over Indian lands. Therefore the state officials have no power or jurisdiction to enforce the state court judgment on the reservation."); *United States v. Morris*, 754 F. Supp. 185, 187 (D.N.M. 1991) (noting New Mexico's lack of civil jurisdiction under Section 1322).

Kansas has never taken any action to acquire civil jurisdiction under Section 1322(a) and the Nation certainly has never consented to Kansas having such jurisdiction. Further, no court has ever ruled that the Nation's 1846 Treaty authorized the incorporation of its Reservation into Kansas—an entity that did not even exist at the time. The Treaty promised the Reservation would be the Nation's "land and home *forever*." Treaty with the Potawatomi Nation, art. 4, 9 Stat. 853 (1846) (emphasis added). The Sheriff, therefore, lacks civil-regulatory jurisdiction to tow or threaten to tow Nation member's vehicles parked on the Reservation.

E.    *Federal law preempts the Sheriff's exercise of civil-regulatory jurisdiction within the Reservation.*

Federal law prohibits the Sheriff from towing (and threatening to tow) Nation member's vehicles on the Reservation. Such actions infringe the Nation's right to make its own laws and be ruled by them. *Bracker,* 448 U.S. at 142-43 (1980). The *Bracker* preemption test balances interests between and among state, tribal, and federal governments. In describing the *Bracker* preemption test, the Supreme Court has rejected a presumption that state laws apply on an Indian reservation absent federal laws to the contrary.

> Justice STEVENS appears to embrace the opposite presumption— that state laws apply on Indian reservations absent an express congressional statement to the contrary. But, as we stated in *White Mountain Apache Tribe v. Bracker*, in the context of an assertion of state authority over the activities of non-Indians within a reservation, "*[t]hat is simply not the law.*" It is even less correct

> when applied to the activities of tribes and tribal members within reservations.

*Cabazon*, 480 U.S. at 216, n.18 (internal citations omitted) (emphasis added).

Here, the interests of the federal government tip strongly in favor of preemption. "The *Bracker* preemption analysis proceeds against a backdrop of tribal sovereignty, including Congress's overriding goal of encouraging tribal self-sufficiency and economic development . . . ." *HCI Distribution, Inc. v. Peterson*, 110 F.4th 1062, 1068 (8th Cir. 2024) (cleaned up); *see also Mescalero Apache Tribe*, 462 U.S. at 334–35 and 335 n.17 (collecting "numerous federal statutes" embodying these goals, such as the Indian Reorganization Act). Here, Congress decided not to give the State civil-regulatory jurisdiction over the Reservation in the Kansas Act, 18 U.S.C. § 3243, or otherwise. *See, e.g.*, *Burdett v. Harrah's Kansas Casino Corp.*, 260 F. Supp. 2d 1109, 1116 (D. Kan. 2003) ("Plaintiff's reliance on Section 3243 is misplaced, however, because that statute relates to jurisdiction over criminal rather than civil proceedings."). Congress passed another act, 25 U.S.C. § 1322(a), allowing the State to acquire civil-adjudicatory and civil-regulatory jurisdiction with the consent of the Nation, but Kansas never took advantage of the statute. These actions show that Congress intended to preempt State civil-regulatory jurisdiction within the Reservation.[9] The federal government has a significant interest in the Nation enforcing its own civil-regulatory laws against its own members on its own Reservation.

The Nation's interest in exercising its civil-regulatory jurisdiction over Nation members' motor vehicles parked within the Reservation is high. By exercising such jurisdiction, the Nation exercises its sovereignty, which federal law recognizes as a key factor. *Peterson*, 110 F.4th at

---

[9] Congress has also expressed that the trust responsibility owed by the federal government to Indian tribes includes the preservation of tribal sovereignty "in order to foster strong tribal governments, Indian self-determination, and economic self-sufficiency." Omnibus Indian Advancement Act, Pub. L. 106–568, 114 Stat 2868 (Dec. 27, 2000).

CORE/0835793.0018/238354448.2

1068. As touched on in *Rodewald*, the Nation has its own motor vehicle code that applies to vehicles on the Reservation. *Rodewald*, 296 Kan. at 1023. Title 17 of the Nation's Law and Order Code deals with motor vehicles. And Section 17–4–23 of Title 17 expressly deals with vehicles parked in a manner that obstructs traffic on a roadway and the towing of such vehicles. This civil regulation applied to Aitkens' vehicle on O Road, and if Aitkens had violated the Nation's law, it was up to the Nation's Police Department to enforce it against Aitkens—not the Sheriff. The Nation has vital interests in protecting and promoting its sovereignty and government.

But the Sheriff's interest in applying state parking and towing laws to Nation members within the Nation's Reservation is quite low. The Nation already has laws to prevent unsafe motor vehicle parking on the Reservation. The Nation has a Police Department which can deal with these issues when they arise. The Nation's police have sufficient resources to enforce the Nation's parking and towing laws against members on the reservation. Recognizing the Sheriff's lack of authority to enforce those state laws would not deprive the state of anything other than perhaps some fines.

## III.   The Nation satisfies the elements required for permanent injunctive relief.

The Nation satisfies the four elements for permanent injunctive relief. First, the Nation succeeds on the merits. The facts about the Sheriff's interference with the Nation's exercise of civil-regulatory jurisdiction at Snak Atak are not in dispute. Nor are the facts about the Sheriff's threat to tow a Nation member's parked, tribally tagged vehicle on the Reservation. The issues are purely legal. Regarding the events at Snak Atak, the Sheriff cannot attempt to stop Nation officials from carrying out a lawful exercise of civil-regulatory jurisdiction on the Reservation by intimidating or threatening to arrest them. And, regarding the Sheriff's threat to tow a Nation member's parked, tribally tagged vehicle on the Reservation, the Sheriff has never acquired civil-

regulatory jurisdiction over Nation members on the Reservation under 25 U.S.C. § 1322(a) or otherwise. The Nation succeeds on the merits of these legal claims because the Sheriff cannot show any lawful method of interfering with the Nation's lawful exercise of civil-regulatory jurisdiction on the Reservation or of acquiring civil-regulatory jurisdiction to enforce State parking and towing statutes (Kan. Stat. Ann. §§ 8-1569 and 1570) against Nation members on the Reservation. The Sheriff simply lacks such powers. *See Lawrence*, 22 F.4th at 909.

Second, the Sheriff's interference with the Nation's exercise of civil-regulatory jurisdiction at Snak Atak and enforcement of state civil-regulatory statutes against Nation members on the Reservation irreparably harms the Nation. *See id*. at 1005 ("The Tenth Circuit has repeatedly stated that . . . an invasion of tribal sovereignty can constitute irreparable injury.") (quotation omitted); *Pierce*, 253 F.3d at 1242, 1251 (finding irreparable harm because "harm to tribal self-government [is] not easily subject to valuation but also, and perhaps more important, monetary relief might not be available to the tribe because of the state's sovereign immunity"). Federal courts have consistently identified state interference with tribal sovereignty as an irreparable injury that is concrete and actual. In a case with similar facts to the facts in this action, a California federal court found a likelihood of irreparable harm to the Chemehuevi Tribe where a County Sheriff was issuing traffic citations to tribal members within the Tribe's Indian Country. *Chemehuevi Tribe v. McMahon,* 2016 WL 4424970, at *11 (C.D. Cal. Aug. 16, 2016) (issuing preliminary injunctive relief). The Chemehuevi Tribe sued the County Sheriff to stop the Sheriff from issuing traffic citations to tribal members. The court recognized that the issuance of traffic citations was civil regulatory in nature (not criminal prohibitory) and found that the issuance of such citations amounted to an infringement on the Tribe's sovereignty that was likely to constitute irreparable harm. *Id.* at *10–11 ("Interference with tribal sovereignty is an

irreparable injury because it cannot be adequately compensated for in the form of monetary damages.") (internal quotations omitted); *see also Seneca Nation of Indians v. Paterson,* 2010 WL 4027795, at *2 (W.D.N.Y. Oct. 14, 2010) (finding irreparable harm where enforcement of a state law would infringe on a tribe's sovereignty).

Third, the harm to the Nation of allowing the Sheriff to violate its sovereign rights, which are protected by federal law, by interfering with its exercise of civil-regulatory jurisdiction on the Reservation or by unlawfully exercising civil-regulatory jurisdiction over Nation members within the Reservation outweighs any harm to the Sheriff. The Sheriff will not be harmed by an injunction stopping him from engaging in unlawful threatening tactics against Nation officials engaged in the lawful exercise of civil-regulatory jurisdiction on the Reservation or from unlawfully enforcing state civil-regulatory statutes against Nation members on the Reservation. The balance of harms, therefore, favors the Nation. *See*, *e.g.*, *Lawrence*, 22 F.4th at 910 ("given our conclusion that Congress has not authorized jurisdiction—this harm does not outweigh the damage to tribal sovereignty that would result from denying the injunction"); *Pierce*, 253 F.3d at 1252 ("[T]he threatened injury to tribal sovereignty outweigh[s] the potential harm to state sovereignty. Federal Indian law is replete with examples in which state law has had to accommodate tribal sovereignty, whether because of federal preemption or because of the guardian-ward relationship between the federal government and Indian tribes.").

Finally, granting the requested injunctive relief would not be adverse to the public interest. There is a public interest in promoting tribal sovereignty and preventing a state from exercising jurisdiction within Indian country that it has never lawfully acquired (especially where, as here, the tribe has never consented to such jurisdiction under 25 U.S.C. § 1322(a)). *See e.g.*, *Lawrence*, 22 F.4th at 910 ("This contract dispute arose on the reservation, and the federal-

- 40 -

law prerequisites for state-court jurisdiction are not met."); *Pierce*, 253 F.3d at 1253 ("[T]his court's case law suggests that tribal self-government may be a matter of public interest."); *Seneca-Cayuga Tribe of Oklahoma v. State of Okla.*, 874 F.2d 709, 716 (10th Cir. 1989) ("[T]he injunction promotes the paramount federal policy that Indians develop independent sources of income and strong self-government.").

Injunctive relief is necessary because the Sheriff has repeatedly expressed the view, in this litigation, that he did nothing wrong and will continue to interfere with the Nation's exercise of its civil-regulatory jurisdiction and to unlawfully exercise civil-regulatory jurisdiction on the Reservation. (Mot. to Dismiss, 1, 4, 10 Dkt. #10 ("State sovereignty, and Sheriff Morse's constitutional and statutory authority, does not end at border of the Prairie Band Potawatomi Nation Reservation's border."; "Plaintiff is incorrect in its assertion that Sheriff Morse has exercised unlawful civil jurisdiction within the reservation."; "Thus, State officials, including Sheriff Morse, have jurisdiction throughout Jackson County including the Tribe's Reservation. This includes the power over persons and property as necessary to preserve the peace."; "First, in such an instance if the Nation officials lack a privilege to remain on the premises and remained after being ordered to leave by the premises owner or authorized person—such would constitute criminal trespass.") (emphases in original)); (Reply in Support of Mot. to Dismiss, 2, 5, Dkt. #18 ("State and county officials possess civil and criminal jurisdiction over the entirety of Jackson County, Kansas, whether within or without the Prairie Band's Reservation."; "A statement that if the Nation's officials commit a crime, they would be subject to arrest, is not an interference with the Tribe's civil regulatory authority.") (emphasis in original)). *See also* Jackson County Sheriff's Office Annual Report (2023) ("The Sheriff is not bound by municipality boundaries, or in Kansas, reservation boundaries.") (emphases added)). If the Sheriff's view were correct, there

- 41 -

would have been no need for the Kansas Act, which expressly gives Kansas criminal—but not civil—jurisdiction over the Reservation.

## CONCLUSION

For the foregoing reasons, the Court should grant the Nation's Motion for Summary Judgment and issue the Nation's requested declaratory and injunctive relief.

* * *

WHEREFORE, the Nation respectfully requests that this Court:

1.    Declare that on May 28, 2024, Sheriff Morse violated the Nation's sovereign rights on its Reservation by interfering in the Nation's lawful exercise of civil-regulatory jurisdiction over the Snak Atak convenience store by intimidating the Nation's officials and threatening those officials with arrest for criminal trespass;

2.    Declare that on August 26, 2021, the Sheriff lacked authority to enforce Kansas' civil-regulatory parking and towing statutes (Kan. Stat. Ann. §§ 8-1569 and 8-1570) against Aitkens, a Nation member who parked his tribally tagged vehicle on the Reservation;

3.    Permanently enjoin the Sheriff from interfering with the Nation's lawful exercise of civil-regulatory jurisdiction on the Reservation by intimidating Nation officials or threatening to arrest them; and

4.    Permanently enjoin the Sheriff from enforcing state civil-regulatory parking and towing laws (Kan. Stat. Ann. §§ 8-1569, 8-1570) against Nation members on the Reservation.

CORE/0835793.0018/238354448.2

Respectfully submitted,

**STINSON LLP**

/s/ *Jere Sellers*

Jere D. Sellers        KS #16405
Rachel E. North        D. Kan. #79121
1201 Walnut Street, Suite 2900
Kansas City, Missouri 64106
Tel:    (816) 691-3190
Fax:    (816) 412-8195
jere.sellers@stinson.com
rachel.north@stinson.com

**and**

**LIPPES MATHIAS LLP**

Carol Heckman, *pro hac vice*
Klint A. Cowan, *pro hac vice*
50 Fountain Plaza, Suite 1700
Buffalo, NY 14202
Tel:    (716) 853-5100
Fax:    (716) 853-5199
checkman@lippes.com
kcowan@lippes.com

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

On February 13, 2026, the foregoing was electronically filed with the Clerk of the Court

by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

s/ *Jere Sellers*