# EXHIBIT 37

### Page 1

```
 1  .
 2            UNITED STATES DISTRICT COURT
 3             FOR THE DISTRICT OF KANSAS
 4  .
 5  .
 6  PRAIRIE BAND POTAWATOMI NATION,
 7         Plaintiff,
 8  .
 9     vs.     Case No. 5:24-cv-04066-KHV-RES
10  .
11  JACKSON COUNTY SHERIFF TIM MORSE,
12         Defendant.
13  .
14  .
15              DEPOSITION OF
16             SHERIFF TIM MORSE,
17  taken on behalf of the Plaintiff, pursuant to
18  Notice to Take Deposition, beginning at 12:52 p.m.
19  on the 10th day of December, 2025, at Fisher,
20  Patterson, Sayler & Smith, 3550 S.W. 5th Street,
21  in the City of Topeka, County of Shawnee, and
22  State of Kansas, before Sandra S. Biggs, Kansas
23  CCR No. 0716.
24  .
25  .
```

### Page 2

```
 1              APPEARANCES
 2  .
 3  .
 4  ON BEHALF OF THE PLAINTIFF:
 5  .
 6     Mr. Klint A. Cowan
 7     Lippes Mathias
 8     201 Robert S. Kerr Avenue, Suite 235
 9     Oklahoma City, Oklahoma  73102
10     405-456-0030
11     kcowan@lippes.com
12  .
13  .
14  ON BEHALF OF THE DEFENDANT:
15  .
16     Mr. David R. Cooper
17     Fisher, Patterson, Sayler & Smith
18     3550 S.W. 5th Street
19     Topeka, KS  66606
20     785-232-7761
21     dcooper@fpsslaw.com
22  .
23  .
24  ALSO PRESENT:
25     Mr. Rory Wheeler
```

### Page 3

```
 1               INDEX
 2  .
 3  .
 4  Certificate ---------------------------- 70
 5  .
 6  .
 7               WITNESS
 8  ON BEHALF OF THE PLAINTIFF:            PAGE
 9  SHERIFF TIM MORSE
10  Direct-Examination by Mr. Cowan          5
11  .
12  .
13              EXHIBITS
14  MORSE DEPOSITION EXHIBIT NO.:         MARKED
15  No 20  9/1/21 e-mail to Clark from Morse    7
16  No 21  JASO Call History Synopsis         10
17  No 22  Aitkens Certification Degree
18         of Indian Blood                   11
19  No 23  Aitkens registration              12
20  No 24  Text messages                     29
21  No 25  Clark report                      36
22  No 26  E-mail string, PBPN 00287-000293   39
23  No 27  3/12/25 To Whom It May Concern
24         letter from Brian Elliott         43
25  .
```

### Page 4

```
 1  No 28  Jackson County Sheriff's Office
 2         2023 Annual Report                55
```

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W 95th Street         800 E 1st Street N
Topeka, KS 66604           Suite 101                  Suite 200
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

Page 5

1  SHERIFF TIM MORSE,
2  called as a witness on behalf of the Plaintiff,
3  was sworn and testified as follows:
4     DIRECT-EXAMINATION
5  BY MR. COWAN:
6     Q.  Can you please state your name for the
7  record?
8     A.  Tim Morse.
9     Q.  And, Mr. Morse, are you employed?
10    A.  Yes.
11    Q.  What's your position?
12    A.  I'm the sheriff of Jackson County,
13 Kansas.
14    Q.  Okay.  How have you been the sheriff of
15 Jackson County?
16    A.  I believe since June 1st of 2011.
17    Q.  What was your work history generally in
18 law enforcement before you became the Jackson
19 County Sheriff?
20    A.  I was a police officer in a small city in
21 Jefferson County and I was a Tribal police
22 officer, I was a deputy sheriff, I was a
23 supervisor with the sheriff's office.  I also was
24 a chief of a small city in Pottawatomie County --
25    Q.  Okay.

Page 6

1     A.  -- before I was appointed sheriff.
2     Q.  Which Tribe did you work as a police
3  officer for?
4     A.  Prairie Band Potawatomi Nation.
5     Q.  And do you recall about the time frames
6  you were in there?
7     A.  It was in the '90's.  Probably '99 into
8  2000.  I wasn't there very long because I
9  transferred to the Fire Department.
10    Q.  Okay.  As sheriff, are you elected?
11    A.  Yes, sir.
12    Q.  Okay.  And when was the last election for
13 sheriff?
14    A.  '24.
15    Q.  2024?
16    A.  Yes.
17    Q.  Okay.  I would like to talk about an
18 incident that occurred on O Road in 2021, I
19 believe.
20    A.  Um-hum.
21    Q.  I'll give you an exhibit.  This is
22 Exhibit 2.
23       MR. COOPER:  We already have 2.
24       MR. COWAN:  We do already have this, but
25 I don't know where it is.

Page 7

1        MR. COOPER:  Oh, I was just saying we
2  have an Exhibit 2.  That's why I started at 2.
3        MR. COWAN:  Oh, you started at 2 for me
4  because I had a 1, yes.
5        MR. COWAN:  I'm thinking plaintiffs,
6  defendants.  I'm screwing it up.  I'm screwing it
7  up.  Okay.  What was your last exhibit?
8        MR. COOPER:  19.
9        THE REPORTER:  This will be 20.
10       MR. COWAN:  All right.  So this will be
11 20.  I apologize.  Thank you.
12       MR. COOPER:  Sorry.
13       MR. COWAN:  No, it's my fault.
14       (THEREUPON, Morse Deposition Exhibit
15 No 20 was marked for identification by the
16 reporter.)
17 BY MR. COWAN:
18    Q.  So Exhibit 20, do you recognize this
19 document?
20    A.  Yeah, I do.
21    Q.  Can you tell me about it?
22    A.  It's a e-mail from me to chief of the
23 Prairie Band Potawatomi Tribal police about a
24 parking incident on O Road.
25    Q.  What's your understanding of the parking

Page 8

1  incident that occurred on O Road?
2     A.  And this was in '21.  A deputy was
3  patrolling, routine patrol and came across a
4  vehicle or some vehicles that were parked in the
5  roadway.  And I guess he believed that it was a
6  hindrance or a hazard on that road because of the
7  way the vehicle was parked and there was a hill
8  there, the crest of the hill.  And so I guess he
9  -- my understanding is he asked the owner or
10 owners of the vehicle or vehicles, I don't know if
11 there was more than one vehicle or not, to move
12 and he had some resistance.  And from what I
13 understand, they were eventually moved.
14    Q.  Do you know whether a ticket was issued
15 from that incident?
16    A.  I don't believe there was.
17    Q.  Okay.  And do you know whether the car or
18 any cars were towed that day?
19    A.  I don't believe there were any cars
20 towed.
21    Q.  Okay.
22    A.  Not to my knowledge.
23    Q.  The incident occurred on O Road.  Was the
24 incident within the reservation boundary to your
25 knowledge?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street    6420 W 95th Street    800 E 1st Street N
Topeka, KS 66604       Suite 101              Suite 200
785-273-3063           Overland Park, KS 66212 Wichita, KS 67202
www.appinobiggs.com    913-383-1131           316-201-1612

Page 9

1  A. Yes, sir.
2  Q. Okay. And that's the Prairie Band
3 Potawatomi Reservation?
4  A. Yes.
5  Q. Okay. And you were not personally on
6 site for that incident?
7  A. Right, I was not.
8  Q. Okay. Do you know whether the driver of
9 the vehicle was a member of an Indian Tribe? I'm
10 referring to the O Road incident. Do you know
11 whether the vehicle owner --
12  A. I can only guess, but I don't know.
13  Q. Okay.
14  A. My understanding was an employee of the
15 Tribe or maybe the LLC, but I don't know who the
16 person was. I remember the last name of Aitkens
17 was somebody that was in -- with that group. I
18 don't know if that was the owner of the vehicle or
19 not. I know that is -- I know there's Tribal
20 members with that last name.
21  Q. Do you know whether the car that was the
22 subject of being asked to move was tagged with a
23 Prairie Band Potawatomi Tribal tag?
24  A. I don't know.
25    MR. COWAN: Okay. I am going to give you

Page 10

1 another document. This would be 21.
2    (THEREUPON, Morse Deposition Exhibit
3 No 21 was marked for identification by the
4 reporter.)
5 BY MR. COWAN:
6  Q. Can you tell me what this document
7 appears to be?
8  A. It's a license tag. Looks like it's a
9 Potawatomi Tribal license plate?
10  Q. What makes you think it's a Prairie Band
11 Potawatomi license plate?
12  A. Well, just at the top where it says -- it
13 says Kansas State and then it says Potawatomi
14 Tribe. So and I don't read a lot of these --
15  Q. Yeah.
16  A. -- anymore. But I'm guessing that's a
17 Tribal tag.
18  Q. Is this a document that's generated from
19 the Jackson County Sheriff Office?
20  A. Was this one or one like this would be.
21  Q. Okay. Can you tell looking at this
22 document what was generate -- who would have
23 generated it?
24  A. Well, it does have the deputy's name on
25 it, so I'm guessing this is ours.

Page 11

1  Q. Jackson County Sheriff's Office?
2  A. Okay. I didn't see the top, yes.
3  Q. Okay.
4  A. Yes.
5  Q. Okay. So based on this document, it
6 appears that the tag -- the license plate of the
7 vehicle that was asked to move was a Prairie Band
8 Potawatomi Tribal license plate, correct?
9  A. I would agree.
10    MR. COWAN: Okay. I'm going to give you
11 another document.
12    (THEREUPON, Morse Deposition Exhibit
13 No 22 was marked for identification by the
14 reporter.)
15    THE REPORTER: 22.
16    MR. COWAN: 22. Thank you.
17 BY MR. COWAN:
18  Q. This is Exhibit 22. You are not going to
19 recognize this. I would represent to you that
20 this is a Prairie Band Potawatomi Nation
21 Certificate Degree of Indian Blood for Kenneth
22 Ordell Aitkens. If I told you he was the
23 owner/driver of the car that was the subject of
24 the O Road incident, would you have any reason to
25 disagree with that?

Page 12

1  A. No, sir.
2  Q. Okay.
3    (THEREUPON, Morse Deposition Exhibit
4 No 23 was marked for identification by the
5 reporter.)
6 BY MR. COWAN:
7  Q. This is Exhibit 23 and you won't
8 recognize this, either. It is -- I will represent
9 to you that it is from the Prairie Band Potawatomi
10 Nation, Titles and Registration office that shows
11 the vehicle that was subject to the potential
12 parking violation on the O Road incident being
13 registered with the Tribe. Would you have any
14 reason to disagree that the car was titled with
15 the Tribe?
16  A. No.
17    THE REPORTER: You can give me one later.
18    MR. COWAN: Oh, I'm sorry.
19    THE REPORTER: It's okay. I'll get his
20 when we're done.
21    MR. COWAN: Okay. Okay. That's all for
22 the O Road incident.
23 BY MR. COWAN:
24  Q. Do you know Bethany Streeter?
25  A. Yes, I do.

Page 13

1  Q. And did she ever work at the Jackson
2  County Sheriff's Office?
3  A. Yes, she did.
4  Q. What was her position?
5  A. She was a dispatcher.
6  Q. Okay. In her position as a dispatcher,
7  did you talk to her on a regular basis?
8  A. Oh, somewhat, you know, but not a lot. I
9  don't spend a lot of time in dispatch.
10  Q. Okay. Did you ever talk to Miss Streeter
11  about the Snak Atak convenience store that is
12  located on the Prairie Band Reservation?
13  A. I don't recall a conversation with her.
14  Q. Okay. Do you recall ever telling her
15  that you, Tim Morse, wanted Tribal officials at
16  the Snak Atak to be arrest?
17  A. No, I never said that.
18  Q. Okay. And if Miss Streeter said that, do
19  you have any idea where she would have gotten that
20  idea?
21  A. That I told -- that I told her to tell --
22  say that again. I'm sorry.
23  Q. Okay. If Miss Streeter made the
24  statement that Tim wants us to arrest Tribal
25  officials at Snak Atak, or words to those effect,

Page 14

1  do you have any idea where she could have gotten
2  that idea?
3  A. Not really.
4  Q. Okay.
5  A. I really don't.
6  Q. Okay. Did you have any conversations
7  with the dispatch supervisor about Snak Atak?
8  A. It's possible. I -- obviously, this was
9  a matter that was going on over a number of days
10  because I was contacted by -- I'm not sure what
11  the gentleman's position was with the Snak Atak,
12  but he was a -- I kind of thought he was like a
13  regional manager or something. But so he'd made
14  some complaints to me. And I think that probably
15  amongst -- probably more like my command staff,
16  hey, the Tribe is trying to get tax money from
17  this entity, but he claims that they've never
18  signed any kind of an agreement with the Tribe.
19  He was emphatic about that. And to me, my
20  understanding, I may be wrong because I'm not an
21  attorney, that the Tribe would have to have an
22  agreement with a non-native entity or person or
23  whatever. And so I didn't -- I couldn't
24  understand how they could do this legally because
25  from what he was telling me. And so I know we

Page 15

1  talked about, well, if they're not -- if they
2  don't have any legal reason to be on the property
3  because this isn't legit, there could be
4  potentially -- if they were asked to leave, they
5  could potentially get charged with trespassing.
6  So I don't know if somebody misconstrued that or
7  not. I don't know.
8  Q. Yeah. So when you say we talked about
9  it, are you referring to an internal conversation
10  at the Jackson County Sheriff's Office?
11  A. Most likely.
12  Q. Okay. And it's --
13  A. I don't remember talking to the dispatch
14  supervisor about it, but he could have -- he could
15  have heard conversation or we have like morning
16  meetings on Mondays. Maybe it was brought up. I
17  don't -- I don't remember. But, you know, I have
18  an undersheriff, had a different undersheriff at
19  that time. And so I could -- within the office
20  could have discussed it with people. And, you
21  know, sometimes people hear what they want to
22  hear. But I don't know. I don't recall ever
23  having a conversation with Bethany about this.
24  I'm not saying I didn't, but I don't remember.
25  Q. Okay. So I can play the video if we need

Page 16

1  to, but I'll just represent to you --
2  A. I've seen it, yes.
3  Q. -- of Bethany -- I'm sorry. Let me start
4  over. There is an audio recording --
5  A. Right.
6  Q. -- of Bethany on dispatch calling one of
7  the deputies and saying words to the effect of Tim
8  wants us to arrest the Tribal officials at the
9  Snak Atak on May 28th, 2024. My question is could
10  Bethany have gotten that idea through these
11  conversations you're referring to that you may
12  have had with the supervisor or around the
13  headquarters office?
14  A. I really don't know but that's -- would
15  be maybe a possibility. I don't know how she came
16  -- I really don't know how she came up with that.
17  Q. Would you agree that she probably heard
18  some conversations to get to the point where she
19  made a statement like that?
20  A. Yeah. I don't think she made -- I don't
21  think she made something up, no. I don't think
22  that she just imagined that. But there was no
23  conver -- her and I have not had any conversation
24  nor have I had any conversation with anyone to say
25  go arrest the Tribal police. My issue wasn't with



5111 SW 21st Street  6420 W 95th Street  800 E 1st Street N
Topeka, KS 66604  Suite 101  Suite 200
785-273-3063  Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com  913-383-1131  316-201-1612

Page 17

1  the Tribal police. You know, what I was being
2  told was that -- Amit was his name. I can't
3  pronounce or remember what his last name was. But
4  he stated that the Tribe was trying to get him to
5  pay taxes to them. And I said, well -- and I had
6  a document from the Department of Revenue that
7  kind of spelled this out. If you were Tribal or
8  is a Tribal owned establishment an if they
9  weren't. So according to that document, they pay
10 taxes to the Department of Revenue. And so I
11 said, well, that's my understanding. And he says,
12 well, they keep coming. They're harassing me.
13 They're trying to get my money to pay taxes to
14 them. I can't pay taxes to both entities. I'll
15 go broke. And so I suggested to him to call -- I
16 said surely you have an attorney. Because he told
17 me -- I asked him how many stores he had. Over a
18 hundred is what he told me. And I said, well,
19 surely you have attorneys. You need to talk to
20 your attorneys. I said you might want to talk to
21 the Department of Revenue, maybe even the AG. And
22 I spoke to a commissioner about it, and the
23 commissioner said, well, could -- we'd like to
24 invite him to come talk to us and so he talked to
25 them on a -- probably on a Monday. And so I

Page 18

1  didn't really -- I only remember talking to him
2  one -- or in person one time.
3      Q.  Him being Amit?
4      A.  Amit, yeah.
5      Q.  Okay.
6      A.  In person.
7      Q.  In person?
8      A.  Yeah.
9      Q.  Where would you have spoken to him in
10 person?
11     A.  At the Snak Atak store.
12     Q.  Okay.
13     A.  I was contacted by Tim Lenz. Tim Lenz is
14 a former mayor of Horton and he's -- he owned a
15 convenience store in Horton and he sold it to this
16 Snak Atak association. And for whatever reason,
17 he was involved with the purchasing of this
18 property on the reservation, the new -- or the
19 convenience store there. And so he contacted me
20 because he knew me and said, hey, the new owners
21 are getting harassed by the Tribe. And Tim's from
22 I would say Indian Country. I mean he grew up in
23 the Horton area of the Kickapoo and he was
24 somewhat familiar. He was a businessman. He says
25 I don't see how that could happen and I said,

Page 19

1  well, I don't either. He said, well, could you
2  talk to them and see if you could help them. And
3  so then I think maybe he call -- some time went
4  by and I didn't go look this guy up. I think he
5  called me again and said have you talked to him
6  and I said no. And so I drove by there one day
7  and stopped, and I kind of was interested in
8  seeing -- because the place had been so run down,
9  and so I was kind of interested in seeing what
10 they've done, you know. He actually give me a
11 tour. But this is when he told me this. And so
12 I think that -- and I'm not saying I wasn't there
13 -- I might have been there a second time, but I
14 didn't meet with anyone.
15     Q.  Okay. And if you can estimate, do you
16 know about how long before the Snak Atak incident
17 -- let me completely start over. One of the
18 central issues of the lawsuit that we're here to
19 talk about today is an incident that occurred at
20 Snak Atak on May 28th, 2024 when Tribal police and
21 Tribal tax officials went to Snak Atak on that
22 date. Do you agree with that?
23     A.  Yes, sir.
24     Q.  Okay. So when we're referring to the
25 Snak Atak incident, we're talking about the May

Page 20

1  28th --
2      A.  Right.
3      Q.  -- incident. Okay. Do you know about
4  how long before the Snak Atak incident you had the
5  visit in person with Amit?
6      A.  It would only be a guess. It seems like
7  it wasn't -- some of these things are greater
8  length of time than what I recall, you know. But
9  I think it was probably within maybe a couple
10 weeks, maybe a month, somewhere in there, but I'm
11 not a hundred percent sure.
12     Q.  Do you recall ever speaking with Raja
13 Rain with Snak Atak?
14     A.  Who?
15     Q.  Raja Rain?
16     A.  I remember that name, but I -- I think
17 maybe that was like a manager, too. But I don't
18 really -- I don't really think I've had a
19 conversation with him.
20     Q.  Okay. So your main contact with Snak
21 Atak was Amit?
22     A.  Right.
23     Q.  Okay. How did Amit describe the Tribe's
24 actions to you in terms of trying to collect taxes
25 from him?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street       6420 W 95th Street        800 E 1st Street N
Topeka, KS 66604          Suite 101                 Suite 200
785-273-3063              Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com       913-383-1131              316-201-1612

Page 29

1  Q. And they ask you to leave, theoretically
2  you could be subject to arrest?
3  A. I did say that.
4  MR. COWAN: Okay. Thank you. I don't
5  think we need to watch the video again. I think
6  that covers it. I've got another exhibit.
7  THE REPORTER: 24.
8  MR. COWAN: Thank you.
9  (THEREUPON, Morse Deposition Exhibit
10 No 24 was marked for identification by the
11 reporter.)
12 BY MR. COWAN:
13 Q. You should recognize this one. This
14 appears to be a short chain of text messages. The
15 name Amit appears at the top. Would you agree
16 with that?
17 A. Yes, sir.
18 Q. And it's dated May 28, 2024 at 8:15 p.m.
19 -- I'm sorry, a.m.
20 A. Okay.
21 Q. Do you recognize this text chain?
22 A. Yes, I provided this.
23 Q. Okay. Do you agree that this text chain
24 is an accurate representation of the conversation
25 you had with Amit through text messages?

Page 30

1  A. Yes, sir.
2  Q. Okay. On page 2, someone says you pay
3  taxes to the state. I would ask them to leave.
4  This is not Tribal property. Did you say that?
5  A. Yes.
6  Q. Okay. And you also say don't give them
7  any money?
8  A. Right.
9  Q. Okay.
10 A. And that was based on my -- what he had
11 told me.
12 Q. Yeah. Did you talk to anyone else other
13 than Amit and the Tim person you mentioned? Was
14 it Tim Lynch?
15 A. Tim Lenz, L E N Z.
16 Q. Did you talk to anyone else besides those
17 two about whether the Tribe could tax the Snak
18 Atak?
19 MR. COOPER: Okay. There I've got to
20 lodge an objection, object to form as to not
21 specific as to time. Tim, you can tell him all
22 the non-privileged conver -- communications you
23 had. You are not to tell him any communication
24 I've had with you about that subject.
25 A. So your question was if I had any

Page 31

1  conversations with Amit and Tim Lenz about --
2  BY MR. COWAN:
3  Q. Yeah, let me try rephrase the question in
4  a better way. Prior to May 28th, 2024, did you
5  have any conversations with anyone about whether
6  the Tribe could tax the Snak Atak?
7  A. With anyone?
8  Q. Other than -- I'm not asking about Amit
9  or Tim Lenz. Anyone else?
10 A. It's very possible, yeah.
11 Q. You don't recall?
12 A. I don't recall specific conversations,
13 but like I said, I could have had conversations at
14 the office --
15 Q. Oh.
16 A. -- with people that work for me. But I
17 don't recall specific conversations. I just -- or
18 anyone on the outside. Well, other than maybe the
19 county commissioner.
20 Q. Yes. Okay. Did the county commissioner
21 say to you that the Tribe cannot tax the Snak
22 Atak?
23 A. Well, I think they agreed with me. I
24 mean I'm guessing they were told the same thing
25 that I was told.

Page 32

1  Q. So your understanding and the county
2  commissioner's understanding and probably Tim
3  Lenz' understanding was that Snak Atak had not
4  signed anything to consent to the Tribe's
5  jurisdiction?
6  A. Correct.
7  Q. So your understanding of what was going
8  on and whether the Tribe had jurisdiction at Snak
9  Atak was based on the premise that Snak Atak had
10 never signed up for Tribal jurisdiction?
11 A. Yes.
12 Q. Okay. Did you -- this may be privileged.
13 But did you ever get an official legal opinion
14 from anyone before May 28th, 2024 about whether
15 the Tribe could tax Snak Atak?
16 MR. COOPER: Well, you didn't have that
17 conversation with me before that so...
18 A. Oh, before the 28th?
19 BY MR. COWAN:
20 Q. Before the 28th.
21 A. Oh, no, I have not. I'm sorry.
22 Q. Okay. I'm not trying to discover -- I'm
23 not trying to get to privileged information. I'm
24 thinking if there's some -- I don't know sometimes
25 when you get a legal opinion, it's a public record

SHERIFF TIM MORSE

Page 69

```
 1  PAGE:LINE FROM     TO         REASON
 2  .
 3  .
 4  .
 5  .
 6  .
 7  .
 8  .
 9  .
10  .
11  .
12  .
13  .
14  .
15  .
16  .
17  .
18  .
19  .
20  .
21  .
22  .
23  .
24  SIGNATURE:_____ DATE:_____
25           SHERIFF TIM MORSE
```

Page 70

```
 1              CERTIFICATE
 2  STATE OF KANSAS
 3  COUNTY OF SHAWNEE
 4       I, Sandra S. Biggs, a Certified Court
 5  Reporter, Commissioned as such by the
 6  Supreme Court of the State of Kansas,
 7  and authorized to take depositions and
 8  administer oaths within said State
 9  pursuant to K.S.A 60-228, certify that
10  the foregoing was reported by
11  stenographic means, which matter was
12  held on the date, and the time and place
13  set out on the title page hereof and
14  that the foregoing constitutes a true
15  and accurate transcript of the same.
16       I further certify that I am not
17  related to any of the parties, nor am I
18  an employee of or related to any of the
19  attorneys representing the parties, and
20  I have no financial interest in the
21  outcome of this matter.
22       Given under my hand and seal this
23  24th day of December, 2025.
24       _____
25       Sandra S. Biggs, C.C.R No. 0716
```

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street      6420 W 95th Street      800 E 1st Street N
Topeka, KS 66604         Suite 101                Suite 200
785-273-3063             Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com      913-383-1131             316-201-1612