# EXHIBIT 39

# BETHANY GAIL PIKE STREETER

## Page 1

1. 
2.     UNITED STATES DISTRICT COURT
3.        FOR THE DISTRICT OF KANSAS
4. 
5. 
6. PRAIRIE BAND POTAWATOMI NATION,
7.         Plaintiff,
8. 
9.   vs.       Case No. 5:14-cv-04066-KHV-RES
10. 
11. JACKSON COUNTY SHERIFF TIM
12. MORSE, in his official capacity,
13.         Defendant.
14. 
15. 
16.           DEPOSITION OF
17.        BETHANY GAIL STREETER,
18. taken on behalf of the Plaintiff, pursuant to
19. Notice to Take Deposition, beginning at 9:10 a.m.
20. on the 9th day of December, 2025, at Fisher,
21. Patterson, Sayler & Smith, 3550 S.W. 5th Street,
22. in the City of Topeka, County of Shawnee, and
23. State of Kansas, before Sandra S. Biggs, Kansas
24. CCR No. 0716.
25. 

## Page 2

1.           APPEARANCES
2. 
3. ON BEHALF OF THE PLAINTIFF:
4. 
5.    Mr. Klint A. Cowan
6.    Lippes Mathias
7.    201 Robert Avenue, Suite 235
8.    Oklahoma City, Oklahoma  73102
9.    405-456-0030
10.   kcowan@lippes.com
11. 
12. 
13. ON BEHALF OF THE DEFENDANT:
14. 
15.   Mr. David R. Cooper
16.   Fisher, Patterson, Sayler & Smith
17.   3550 S.W. 5th Street
18.   Topeka, KS  66606
19.   785-232-7761
20.   dcooper@fpsslaw.com
21. 
22. 
23. ALSO PRESENT:
24.   Mr. Rory Wheeler
25.   Sheriff Tim Morse

## Page 3

1.             INDEX
2. 
3. 
4. Certificate ---------------------------- 57
5. 
6. 
7.            WITNESS
8. ON BEHALF OF THE PLAINTIFF:           PAGE
9. BETHANY GAIL STREETER
10. Direct-Examination by Mr. Cowan       4
11. Cross-Examination by Mr. Cooper       50
12. 
13. 
14.           EXHIBITS
15. STREETER DEPO EXHIBIT NO.:         MARKED
16. No 1  5/28/24 call history           45
17. 
18. 
19. 
20. 
21. 
22. 
23. 
24. 
25. 

## Page 4

1.        BETHANY GAIL STREETER,
2. called as a witness on behalf of the Plaintiff,
3. was sworn and testified as follows:
4.      MR. COWAN:  Are we ready?
5.      THE REPORTER:  Um-hum.
6. DIRECT-EXAMINATION
7. BY MR. COWAN:
8.    Q.   Good morning, Ms. Streeter?
9.    A.   Yes.
10.   Q.   Can you go ahead and spell your name for
11. the record?
12.   A.   B E T H A N Y, G A I L, S T R E E T E R.
13.   Q.   Okay.  And I understand you worked for
14. the Jackson County Sheriff as a dispatcher?
15.   A.   Yes, sir.
16.   Q.   Okay. Can you tell me about when you
17. started?  Give me kind of the time frame of when
18. you worked there, when you started.
19.   A.   I started -- I was working as a nurse
20. still, so would have been 2022, January 2022, I
21. believe, and I left completely about a year ago,
22. so December 2024.
23.   Q.   Okay.  So you were there basically 2022,
24. 2023 and 2024?
25.   A.   Yes, sir.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street         6420 W 95th Street          800 E 1st Street N
Topeka, KS 66604            Suite 101                   Suite 200
785-273-3063                Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com         913-383-1131                316-201-1612

## BETHANY GAIL PIKE STREETER

```
                                                    Page 5
 1     Q.  Okay.  And can you tell me about your
 2  job, what you do as a dispatcher?
 3     A.  So for dispatch, we answer calls from the
 4  outside, both 911 and generic phone calls.  We
 5  pass calls to the deputies or to fire.  We also
 6  at times got calls for areas outside.  Sometimes
 7  we got calls for Shawnee County, sometimes for
 8  Tribe, sometimes for Nemaha County and we'd pass
 9  it to them.
10     Q.  Okay.  And who was your employer in that?
11  Was it Jackson County?
12     A.  Jackson County Sheriff's Office.
13     Q.  Jackson County Sheriff's Office?
14     A.  Um-hum.
15     Q.  Okay.  But sometimes you would get calls
16  that related to other jurisdictions?
17     A.  Yes, sir.
18     Q.  Okay.  What was your regular working
19  schedule?
20     A.  It did rotate for a time period, so I
21  would do some 7 p.m. to 7 a.m. and some 7 a.m. to
22  7 p.m.
23     Q.  Okay.  When you're working on dispatch
24  for the Jackson County Sheriff's Office, are you
25  the only person on duty when you're on duty?
```

```
                                                    Page 6
 1     A.  It depends on the shift.  Some shifts
 2  yes, some shifts no.
 3     Q.  Okay.  So how many other dispatchers
 4  might be working at the same time as you?
 5     A.  One to two --
 6     Q.  Okay.
 7     A.  -- other dispatchers.
 8     Q.  Other?
 9     A.  Um-hum.
10     Q.  So during a busy time, you might have
11  three dispatchers?
12     A.  Three with might like one of those would
13  be the supervisor, yes, sir.
14     Q.  Okay.  And let's see.  You said you get
15  calls from 911 that come through?
16     A.  Yes, sir.
17     Q.  Okay.  How does it work if deputies are
18  out on a call and they're communicating with each
19  other?  Do those calls ever come through the
20  dispatcher?
21     A.  Their cell phone calls, no.
22     Q.  Okay.
23     A.  Their cell phones are direct.  Whereas if
24  we called a deputy, it goes to -- like we can
25  call their cell phone, their work phone.
```

```
                                                    Page 7
 1     Q.  Okay.  So if someone, say the sheriff,
 2  for instance, called you, just hypothetically --
 3     A.  Um-hum.
 4     Q.  -- and you wanted to relay that
 5  information to a deputy out in the field --
 6     A.  Uh-huh.
 7     Q.  -- how would that work?
 8     A.  Either via cell phone or via radio.
 9     Q.  Would you pick up your cell phone to call
10  the deputy?
11     A.  No, sir.
12     Q.  Okay.  Walk me through the process of
13  what you use like physically to make that call?
14         MR. COOPER:  Go ahead.  Keep that -- his
15  answer but wait until he gets to the question mark
16  before you answer.
17         THE WITNESS:  Sorry about that.
18         MR. COWAN:  Thank you, David.
19     A.  So say I need to send something to the
20  deputy, I would call on the work phone.  We have
21  multiple lines, and I'd call the deputy's cell
22  phone.
23     BY MR. COWAN:
24     Q.  Okay.  Are those the same phones that you
25  would use for picking up a call from 911 or an
```

```
                                                    Page 8
 1  emergency?
 2     A.  There are three -- I believe three,
 3  possibly four.  Again, it's been a little while.
 4  Possibly four 911 lines, and then there are at
 5  least three non-emergent lines if I remember
 6  correctly.  I know there's two for sure.  I think
 7  there's three non-emergent, and they are the ones
 8  we would use to call the deputy.
 9     Q.  Okay.
10     A.  On our screen, you click which one you
11  want to use.
12     Q.  Oh, okay.  So it's through a computer
13  screen that you pick which one?
14     A.  Yes, sir.  Um-hum.
15     Q.  Okay.  And there are emergency lines and
16  there are non-emergency lines?
17     A.  Yes, sir.
18     Q.  Okay.  What -- can you give me an example
19  of a reason the sheriff or a deputy might call you
20  while people are out in the field?
21     A.  Like if the deputy, say, one of the
22  deputies is not on the call and they need to get
23  ahold of us?
24     Q.  Yeah.  For instance, what would that look
25  like?
```



5111 SW 21st Street          6420 W 95th Street          800 E 1st Street N
Topeka, KS 66604             Suite 101                   Suite 200
785-273-3063                 Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com          913-383-1131                316-201-1612

## BETHANY GAIL PIKE STREETER

Page 9

1   A.  Usually, a deputy would call in and it
2  would go to one of our non-emergent lines, and
3  then they would talk to us.  So you can hear the
4  radio.  Like if I'm on the phone, the radio is
5  talking through the speaker, not my headset.
6   Q.  Okay.
7   A.  If I'm not on the phone, it's talking
8  through my headset, the radio is.
9   Q.  Okay.  So I guess what I'm trying to
10 figure out is why sheriff or a deputy would call
11 you rather than calling folks who are already out
12 in the field?  What -- how does it help coordinate
13 everything by calling the dispatcher directly?
14  A.  So the deputies in the field might be
15 hands-on or might be dealing with some other
16 situation and not be able to pick up their cell
17 phone.  That might put them more at risk.
18  Q.  That makes sense.  Okay.
19  A.  Um-hum.
20  Q.  So is it a regular occurrence that when
21 people are out in the field on the call -- on a
22 call that the sheriff or a deputy would call
23 through the dispatcher to communicate something to
24 folks out in the field?
25  A.  No.  I don't -- in those two years, I

Page 10

1  don't think.  The only time I had the sheriff call
2  in would be if it was a chase or something.
3   Q.  Okay.  So the sheriff calling you did not
4  happen every time there was an event out in the
5  field?
6   A.  No, sir.  Very rarely.
7   Q.  Very rarely.
8   A.  Yeah.
9   Q.  Okay.  I'm going to bring up a specific
10 day --
11  A.  Um-hum.
12  Q.  -- when there was an incident.  It was I
13 believe May 28th, 2024.
14  A.  Okay.
15  Q.  There was a call or for some reason the
16 deputies were out at Snak Atak.  Do you remember
17 anything about that?
18  A.  I remember -- I mean deputies have gone
19 out to Snak Atak several times.
20  Q.  Okay.
21  A.  I remember a few of those incidents
22 without knowing more.
23  Q.  Yeah.  Are there multiple Snak Ataks in
24 Jackson County?
25  A.  At the time that I worked at the

Page 11

1  sheriff's office, no.
2   Q.  Okay.
3   A.  I do not -- I know -- I don't think
4  there's anymore now.  I do know of other counties
5  that have Snak Ataks now.
6   Q.  Okay.  So when we refer to Snak Atak in
7  Jackson County during the time you were at the
8  dispatcher's office, can you describe the location
9  of that store or what you know about that store?
10  A.  I know that it was locally owned, and
11 then it was bought out by another individual.  It
12 was south of Holton.
13  Q.  Okay.  Did it have the name Snak Atak
14 under the prior owner before it was sold?
15  A.  I don't believe so.
16  Q.  Okay.
17  A.  I don't believe so.  Because I believe
18 that's the chain that the new -- new owners
19 bought.
20  Q.  Right.
21  A.  Or brought with it, sorry.
22  Q.  Okay.  So today, for purposes of our
23 conversation, when we refer to Snak Atak we're
24 referring to the one that was in Jackson County
25 south of Holton.  That's correct, right?

Page 12

1   A.  Yes, sir.
2   Q.  Okay.  Do you know whether that Snak Atak
3  was on the Prairie Band Potawatomi Reservation?
4   A.  I believe it's in the area of it.  I
5  don't know that -- without looking at a map, I
6  don't know the exact location of the draw lines.
7   Q.  Right.  Okay.
8   A.  Because I haven't had to look at that in
9  a while.
10  Q.  Sure.  Do you remember any specific calls
11 that you got in the dispatcher's office to go out
12 to Snak Atak?
13  A.  I remember that the Snak Atak owner
14 called us when there were Tribal officers that had
15 shown up, yes.
16  Q.  Okay.  Was -- were there multiple times
17 that that happened?
18  A.  While I was on duty, I don't remember.  I
19 know of one specific when I was on duty.
20  Q.  Okay.  If I said that I think that call
21 occurred on May 28th, 2024, would you be able to
22 confirm that that was the date when that call
23 occurred?
24  A.  Honestly, I would not.  The exact date,
25 no.



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street        6420 W 95th Street        800 E 1st Street N
Topeka, KS 66604              Suite 101                Suite 200
785-273-3063          Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com       913-383-1131             316-201-1612

Page 13

1   Q.  Right.
2   A.  But if -- I mean I know it was within the
3  last year that I was there.  I just don't remember
4  the exact day, no.
5   Q.  And that would be -- the time range of
6  May 2024 would be within the last year that you
7  were there?
8   A.  Yes, sir.
9   Q.  Okay.  Can you tell me what you do
10 remember about that incident when the owners of
11 the Snak Atak called because Tribal officials were
12 at their business?
13  A.  I remember we had a call prior.  I
14 believe it was before I got on shift, within the
15 week prior, and so there had been talk of we're
16 there for the business owner, you know.  If he
17 calls, we're going to show up.  It was portrayed
18 through my supervisor and others, I honestly
19 couldn't tell you the right day, the right time,
20 any of that, that if the shop owner called us that
21 we were to go back him up in whatever way was
22 necessary.  I was never talked to directly by
23 anyone besides my supervisor and I believe it was
24 one of the deputy supervisors.  I couldn't tell
25 you at the time which one, but it wasn't straight

Page 14

1  from like sheriff or undersheriff or anyone like
2  that.
3   Q.  Okay.  So a week or so before the
4  incident where you sent sheriff's deputies out to
5  Snak Atak, you were told by someone that if Snak
6  Atak calls we're going to send people out.  Is
7  that fair to say?
8   A.  Within that week, yes.  Within that day
9  or week period, yes.
10  Q.  Okay.  Did the person telling you that
11 say anything about the Tribe in that conversation?
12  A.  To the effect of if the shop owner wants
13 them trespassed, we can trespass them but...
14  Q.  Okay.  And what was your understanding of
15 that statement?
16  A.  That they're not supposed to be there.
17  Q.  That who's not supposed to be there?
18  A.  The -- that the Tribal police didn't need
19 to be where the Snak Atak owner was, that they
20 were all handling it outside.
21  Q.  Okay.  So your understanding was that if
22 the Tribal -- sorry.  Let me start over.  Was it
23 your understanding that if Tribal officials came
24 to Snak Atak that they could be committing
25 criminal trespass?

Page 15

1   A.  If the Snak Atak person spoke to the
2  deputies about that, yes.
3   Q.  Okay.  And that was based on a
4  conversation with your supervisor?
5   A.  Super -- and it was in like the dispatch
6  office, so I couldn't tell you who all, but it was
7  with our little group, yes.
8   Q.  Okay.  So it could have been -- who are
9  the people that it could have been that said that
10 to you?
11  A.  Could have been my supervisor, the other
12 dispatcher, a couple deputies usually in and out,
13 but all -- this is what we heard, this is how it
14 will probably go down if this happens.
15  Q.  Okay.  Could it have been the sheriff who
16 said that to you?
17  A.  No, sir.  I usually didn't see the
18 sheriff.
19  Q.  Okay.  How often did you see deputies
20 around in the dispatch office?
21  A.  Well, it depended on call log.  If they
22 came in to -- if they arrested someone, they came
23 in and got their paperwork, so they were usually
24 there at the beginning of shift, end of shift, so
25 7 a.m., 7 p.m. -- well, 6:30-ish.  And then if

Page 16

1  they had to get something throughout the day but
2  not real often.
3   Q.  Okay.  Let's talk about the physical
4  structure of your dispatch office.
5   A.  Um-hum.
6   Q.  What kind of a building is it located in
7  in terms of who else is in the building?  Was the
8  dispatchers?
9   A.  So where the dispatchers is is a locked
10 door, and we have our own bathroom, our own
11 microwave, our own fridge.  So unless we need to
12 go like to the kitchen or take paperwork back to a
13 deputy in their offices while they're doing
14 paperwork, we didn't leave our office.  And the
15 door -- especially since COVID, they kept the door
16 shut.  People didn't come in and out a whole lot.
17  Q.  Okay.  So correct me if I'm wrong.  It
18 sounds like the dispatch office is in a building
19 that also contains the rest of the Jackson County
20 Sheriff Office?
21  A.  Yes, sir.
22  Q.  Okay.  So there's a building that is the
23 headquarters of the Jackson County --
24  A.  Yes, sir.
25  Q.  -- office?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W 95th Street        800 E 1st Street N
Topeka, KS 66604           Suite 101                 Suite 200
785-273-3063               Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

Page 17

1  A. Jackson County Sheriff's Office, yes.
2  Q. Thank you. Okay. And in that building,
3  there's an area for the dispatchers?
4  A. Yes, sir.
5  Q. And you're essentially closed off from
6  the other offices?
7  A. Yes, sir.
8  Q. Although you could go through that door
9  if you needed to?
10 A. Yes, sir.
11 Q. Okay. So why would a deputy from the
12 other part of the building come into the dispatch
13 area and talk to you all?
14 A. One is if they've gotten previous calls
15 and they're like, hey, if we get this type of
16 call, make sure you send two to three people out,
17 like if it's domestic related. Or, hey, we're
18 watching this house for such and such, like animal
19 cruelty or something. If you get a call, put it
20 over the private channel, not where all public can
21 hear. So, mainly, if they have information for us
22 that we might get throughout the day.
23 Q. Okay. So they're just giving you
24 instructions basically on calls that might come in
25 or things that you might need to know as the

Page 18

1  dispatcher about certain types of calls?
2  A. Yes, sir.
3  Q. Okay. So would you see deputies every
4  single day while you were on shift?
5  A. More or less, yes.
6  Q. Okay. Going back to the Snak Atak
7  business, were you given any specific instructions
8  before a call came in from the Snak Atak owners
9  about the Tribal officials being there?
10 A. About the Tribal police or the Tribe
11 officials?
12 Q. Either.
13 A. Just the only thing I got was to send
14 everyone. And again, from like my supervisor and
15 how he had portrayed it was if they are criminally
16 trespassing, then things can go taken that way.
17 Q. Okay. And was that aimed specifically at
18 the Tribal police or the Tribal officials or both?
19 A. I only dealt with the Tribal police, so
20 that was -- that was how I took it.
21 Q. Okay. So in your recollection, if you
22 got a call from the Snak Atak owners, it would be
23 because Tribal police were on scene?
24 A. Yes, sir.
25 Q. Okay. Do you understand that there are

Page 19

1  also Tribal Tax Commission officers who are not
2  Tribal police who may have visited Snak Atak?
3  A. That was not in the call at the time that
4  I --
5  Q. Okay.
6  A. No call that I took, no.
7  Q. Okay. So your instructions about calls
8  from Snak Atak involved only the Tribal police?
9  A. Yes, sir.
10 Q. Okay. If your supervisor in general was
11 to give you an instruction about how we handle a
12 certain type of call, where would that instruction
13 originate?
14 A. I couldn't speak on that because I don't
15 know.
16 Q. Okay.
17 A. I just go from him.
18 Q. Okay. So you don't know who told your
19 supervisor to send folks out to Snak Atak if the
20 Tribal police were there?
21 A. Correct.
22 Q. Okay. And is your -- was your supervisor
23 a deputy?
24 A. No, sir.
25 Q. Okay. So the supervisor is a non-law

Page 20

1  enforcement officer?
2  A. Correct.
3  Q. Okay. How many dispatchers were employed
4  at the time that you were there total?
5  A. Seven to ten, I believe.
6  Q. Okay. And was your supervisor also a
7  dispatcher who would handle calls coming in?
8  A. Yes, sir.
9  Q. Okay. Do you know who the -- who your
10 supervisor reported to above them?
11 A. Honestly, I don't know the hierarchy. I
12 know eventually it would be the sheriff, but I
13 know that there's captains and undersheriff. So I
14 don't know who he would go to.
15 Q. Okay. All right. Thinking about the day
16 when you actually got a call about Snak Atak --
17 A. Um-hum.
18 Q. -- can you describe to me what you recall
19 about that incident?
20 A. I remember the owner calling us stating
21 there were Tribal PD there, so we sent deputies
22 out. I honestly couldn't tell you which deputy
23 that I spoke to. But I do believe even the
24 supervisor of the deputies went out, like the
25 sergeant went out there. We spoke about the

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street          6420 W 95th Street        800 E 1st Street N
Topeka, KS 66604             Suite 101                 Suite 200
785-273-3063                 Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com          913-383-1131              316-201-1612

Page 21

1  situation and that I had been told through third
2  party that if there were conflicts, it could be
3  trespassing.
4      Q.  Okay.  I apologize if you just said this,
5  but can you tell me who initially told you about
6  the Tribal police officers being on site at Snak
7  Atak?
8      A.  The Snak Atak individual.
9      Q.  Okay.
10     A.  The owner.
11     Q.  So you actually --
12     A.  There was a call from Snak Atak if I
13 remember right.
14     Q.  To the dispatch office?
15     A.  I believe it was a 911.
16     Q.  Okay.
17     A.  I think.  I honestly -- whether it was
18 911 or through the non-emergent line, I couldn't
19 tell you.
20     Q.  Okay.  So you get a call into either the
21 emergency line or the non-emergent line.  You pick
22 up the phone, and the person calling you about the
23 Tribal police being on site at Snak Atak is the
24 owner of Snak Atak?
25     A.  I believe so --

Page 22

1      Q.  Or --
2      A.  -- yes.  Represented as the manager or
3  the owner.
4      Q.  A representative of Snak Atak?
5      A.  Yeah, um-hum.
6      Q.  Okay.  Do you recall that individual's
7  name?
8      A.  I do not, no.
9      Q.  Can you give me a sense of how the conver
10 -- that initial conversation with the
11 representative of Snak Atak, can you give me a
12 sense of how that went?
13     A.  In all honesty without listening to
14 anything, no.
15     Q.  Okay.
16     A.  I've had a lot happen in the last year
17 and a half, so no.
18     Q.  Okay.  You mentioned a moment ago that
19 there were conversations about sending people out
20 or about the Snak Atak --
21     A.  Um-hum.
22     Q.  -- issue.  Can you tell me who you were
23 having those conversations with?
24     A.  Well, again, it's -- the same deputies
25 aren't always on our shifts.  So I remember having

Page 23

1  previous conversations but not -- like I could
2  work with these two deputies and these two
3  deputies on two different days.  So being a year
4  and a half ago, I couldn't tell you.
5      Q.  Yeah.  Okay.  It sounded like in your
6  previous answer, you were saying you got a call
7  from Snak Atak, and then there were some
8  conversations you had either with people in the
9  office or the deputies or the sheriff about what
10 was going on at Snak Atak?
11     A.  Um-hum.
12     Q.  Is that what happened?
13     A.  I got the Snak Atak call that day.  It
14 was previous -- it was brought up in our dispatch
15 of, hey, we've been having ongoing calls, this is
16 the background, and it was only in the dispatch.
17 Or, like I said, the deputy supervisor each day
18 would come tell us if we get this call, make sure
19 you send two to three deputies.
20     Q.  Okay.  So you were referring back to
21 earlier --
22     A.  Yes.
23     Q.  -- conversations?
24     A.  Yeah.
25     Q.  Okay.  So just to be clear, you were told

Page 24

1  that if Snak Atak calls because Tribal police are
2  on site, you're to send two or three deputies?
3      A.  Yes, sir.
4      Q.  Okay.  And do you recall who said those
5  words?
6      A.  It would have either been my supervisor
7  or the deputy supervisor that day.
8      Q.  Okay.  I'm sorry.  But what does deputy
9  supervisor mean?
10     A.  So like the sergeant of the shift.  So
11 like -- like where I'm at now, I have shift leads.
12 So it's the sergeant of the shift.
13     Q.  Okay.  And that person is a law
14 enforcement sergeant?
15     A.  Yes, they're a deputy.  They just have
16 the rank of sergeant just like sergeant, captain,
17 lieutenant, undersheriff, sheriff.
18     Q.  Okay.  Thinking back to the day when you
19 got the call from Snak Atak, after you get off the
20 phone with the Snak Atak representative, what do
21 you do then?
22     A.  I believe I -- this is I mean poor
23 memory, but I would assume I radioed out to have
24 two to three deputies respond.  And then I know I
25 made a call but, again, I don't know if it was to



Page 25

1  the deputy sergeant.  I don't -- or the first --
2  there's different areas in our county.  So there's
3  1, 2 and 3.  That would have been in Section 3,
4  so I don't know if I called that deputy to give
5  them a heads-up of the scenario.  But sometimes we
6  don't want information put out over the radio --
7      Q.  Right.
8      A.  -- where because public can hear.  And
9  then sometimes we call directly.
10      Q.  Okay.  Do you recall whether you used the
11  radio to send deputies out to Snak Atak that day?
12      A.  I honestly do not, no.
13      Q.  Okay.  So you made --
14      A.  Because if they were in the office, then
15  we called their work phone because they don't
16  always have the great service on the portables
17  back in a concrete building.
18      Q.  Okay.  So you may have called them on
19  their cell phone and sent them out?
20      A.  Or their work -- like the desk phone,
21  yeah.
22      Q.  Awe.
23      A.  Whichever one.
24      Q.  Okay.  So they could have -- you could
25  have called them on their desk phone.  You could

Page 26

1  have called them --
2      A.  Or their cell phone, um-hum.
3      Q.  You could have called them on their cell
4  phone, you could have called them on their desk
5  phone, you could have called them on the radio?
6      A.  Yes, sir.
7      Q.  Okay.  And you don't recall which one?
8      A.  No, sir.
9      Q.  Okay.  After they go -- I think there was
10  another dispatcher on duty around that time?
11      A.  Yes, sir, there was.
12      Q.  Do you recall her name?
13      A.  I believe it was Meagan.  That's who I
14  usually worked with.
15      Q.  Okay.  Do you recall Meagan's last name?
16      A.  Shea.
17      Q.  Okay.  But you are the one who actually
18  sent the deputies out to Snak Atak?
19      A.  I believe so, yes.
20      Q.  Okay.  It wouldn't have been Meagan?
21      A.  I don't believe so.
22      Q.  Okay.  And you were the one who spoke to
23  a Snak Atak representative who called in to the
24  dispatch?
25      A.  I believe so, yes.

Page 27

1      Q.  Okay.  After you sent the deputies out to
2  Snak Atak, do you recall anything else about that
3  incident happening that day?
4      A.  I remember it went calmly, if I remember
5  right.  The Tribal PD left, deputies left and they
6  went on their way.
7      Q.  Okay.
8      A.  I mean they were out there for a while,
9  but that's the short story.
10      Q.  Got it.  Do you recall you having any
11  other conversations with deputies that day?
12      A.  Not per se about that situation, no, not
13  after, not before, no.
14      Q.  Okay.  Do you recall having any
15  conversations with anyone on scene while the
16  Tribal police officers were at Snak Atak?
17      A.  Not off the top of my head.  If it was
18  played back maybe, but not off the top of my head,
19  no.
20      MR. COWAN:  Yeah.  Okay.  Do you mind if
21  we take a quick break, David?
22      MR. COOPER:  That's fine.
23      MR. COWAN:  Are you okay?
24      THE WITNESS:  Yeah.
25      MR. COWAN:  Okay.  If we could take a

Page 28

1  short break that would be great.
2      (THEREUPON, a recess was taken.)
3  BY MR. COWAN:
4      Q.  Do you recall having any other
5  conversations with any representatives of Snak
6  Atak?
7      A.  Not off the top of my head, no.
8      Q.  Okay.  Were you friends with anyone from
9  Snak Atak outside of your job?
10      A.  No, sir.
11      Q.  Okay.  Do you recall any conversations
12  with the sheriff the day of the Snak Atak
13  incident?
14      A.  No, sir.  I maybe saw the sheriff once a
15  week, if that, just because of his means our door
16  being shut, stuff like that.  He didn't usually
17  come into dispatch.
18      Q.  Okay.  Not only of the day of the Snak
19  Atak incident --
20      A.  Um-hum.
21      Q.  -- but just in general, did you ever have
22  a conversation with the sheriff about Snak Atak?
23      A.  No, sir.
24      Q.  Okay.  You don't recall any
25  conversations?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W 95th Street        800 E 1st Street N
Topeka, KS 66604             Suite 101                  Suite 200
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

Page 29

1  A.  No, sir.
2  Q.  Okay.  Would anyone, whether it was a
3  deputy or your supervisor, on the day of the Snak
4  Atak incident have told you what the sheriff wants
5  done about Snak Atak?
6  A.  If they did, it would have been in a -- I
7  don't want to say a roundabout way.  It would have
8  been not dir -- you know, it's not coming directly
9  from him if that makes sense.  Like nobody spoke
10  -- of my acknowledgement, nobody spoke to Tim on
11  it on that day or any day prior of specific
12  things.
13  Q.  Nobody said the sheriff wants to handle
14  -- sorry.  Let me start over.  You don't recall
15  anyone saying to you the sheriff wants us to
16  handle the Snak Atak issue in a particular way?
17  A.  Only with the criminal trespass.  Like,
18  again, it was from my supervisor.  If it becomes
19  an issue, it will be brought up as criminal
20  trespassing.
21  Q.  Okay.
22  A.  Which can lead to other things.
23  Q.  What other things did you understand that
24  that could lead to?
25  A.  That at some point if they refuse to

Page 30

1  leave, it could lead to arrest.
2  Q.  Okay.
3  A.  But again, that's not -- I mean that's
4  how we handle all criminal trespass.  That's not
5  specific to this one situation.
6  Q.  Sure.  So there's two different law
7  enforcement entities involved here?
8  A.  Um-hum.
9  Q.  So I just -- I want to drill down a
10  little bit and be really clear about what you're
11  saying.  Your understanding was that the Jackson
12  County Sheriff's Office or its deputies could
13  arrest the Tribal police officers at Snak Atak?
14  A.  If it involved criminal trespass, if
15  there was a criminal trespass order, yes.
16  Q.  And your understanding was that the
17  persons doing the criminal trespass at Snak Atak
18  were the Tribal police officers?
19  A.  From all the conversations that had been
20  occurring, yes.
21  Q.  Okay.  So when you were hearing about
22  there may be a criminal trespass issue at Snak
23  Atak, that was not referencing hoodlums or non-
24  Tribal people coming in and trespassing at Snak
25  Atak.  It was related to the Tribal PD folks?

Page 31

1  A.  And -- yes.
2  Q.  Okay.  That was your understanding?
3  A.  Yes, my understanding.
4  Q.  Okay.  Okay.  Do you recall anyone saying
5  to you that the deputies need to go out and arrest
6  the Tribal police officers at Snak Atak?
7  A.  Again, it would just be if there was that
8  criminal trespass and then follow procedure for
9  that.
10  Q.  Okay.  Do you -- as a dispatcher, are you
11  trained in what criminal trespass means?
12  A.  Not to the in-depths of a law enforcement
13  officer, no.
14  Q.  Did you have an understanding of what
15  things need to happen to trigger criminal
16  trespassing as a dispatcher?
17  A.  To a small point, yes.
18  Q.  How --
19  A.  But again, that's not -- that's for the
20  deputies to decide.
21  Q.  No, I get you.  I'm just trying to
22  understand what your understanding was of what
23  criminal trespass means in that situation.
24  A.  If the law state -- like if they go
25  through the right procedures and the individual

Page 32

1  wants another individual criminally trespassed
2  because of harassing them, along those lines, then
3  law enforcement takes control.
4  Q.  Okay.  Did anyone ever say that the
5  Tribal Police Department was harassing the Snak
6  Atak folks?
7  A.  I couldn't say if anyone used that exact
8  words, but I feel like that's why the Snak Atak
9  people called us.
10  Q.  You understood that the Snak Atak people
11  felt harassed by the Tribal Police Department?
12  A.  Yes.
13  Q.  Okay.  I apologize if I've already asked
14  this, but you don't recall any other calls from
15  the Snak Atak folks about the Tribal Police
16  Department other than the one on the day we're
17  talking about?
18  A.  Not that I took, no, hum-um.
19  Q.  Okay.  Did you hear about any others in
20  the office?
21  A.  I mean I feel like there probably was
22  other calls because it was brought up, you know,
23  if you get a call like this, send all three
24  people.  That only happens if we get previous
25  calls.



5111 SW 21st Street  
Topeka, KS 66604  
785-273-3063  
www.appinobiggs.com

6420 W 95th Street  
Suite 101  
Overland Park, KS 66212  
913-383-1131

800 E 1st Street N  
Suite 200  
Wichita, KS 67202  
316-201-1612

BETHANY GAIL PIKE STREETER

Page 33

1  Q.  So you would have been given directions
2  about how to handle it because there would have
3  been multiple calls at some point?
4  A.  Yes, sir.
5  Q.  Okay.  You probably have no idea, but do
6  you know whether the Snak Atak folks could call
7  the sheriff on his cell phone?
8  A.  Not -- I mean up until I worked there, I
9  didn't have the sheriff's number, so I don't
10  foresee that happening.
11  Q.  Okay.
12  A.  But, no, I have no idea.
13  Q.  Right.  All right.  And I think you
14  testified that you don't recall having any
15  conversations with the sheriff on the day we're
16  talking about about Snak Atak or Tribal PD?
17  A.  I don't recall any conversations with the
18  sheriff on that day or any other day --
19  Q.  Okay.
20  A.  -- about Snak Atak.  Like I said, the
21  sheriff came into dispatch randomly but not very
22  often, because he had a little bit more important
23  stuff to do.
24  Q.  You did say that earlier.  I apologize
25  for asking twice.  Let me open my computer.  I

Page 34

1  have on my computer an audio file from the
2  sheriff's office that was produced to me as part
3  of this court case.
4  A.  Um-hum.
5  Q.  So this audio file came to me from the
6  sheriff?
7  A.  Okay.
8  Q.  I'd like to play it for you --
9  A.  Um-hum.
10  Q.  -- and then ask you a few questions about
11  it.
12  A.  Okay.
13      (THEREUPON, the video was played.)
14      MR. COWAN:  Okay.  For the record, this
15  file is identified as Morse, M O R S E, underscore
16  000017-20240528-175013735-C O N S O L E-1-H1 L U F
17  F C B?
18      THE REPORTER:  B as in boy?
19      MR. COWAN:  Yes.
20  BY MR. COWAN:
21  Q.  Okay.  Do you recognize the female voice
22  on the audio recording?
23  A.  Yes, sir, that's me.
24  Q.  It's you?
25  A.  Yes, sir.

Page 35

1  Q.  Okay.  And do you recognize the other
2  voice?
3  A.  Honestly, no, I don't.
4  Q.  Okay.  Do you think it was a deputy?
5  A.  It would have been a deputy because I was
6  talking to them about them responding.
7  Q.  Okay.  And if you know, would that audio
8  recording have come from the radio?
9  A.  No.  I could hear the radio in the back.
10  That would have been a -- I'm assuming a -- my
11  line to their work like back at their desk from
12  the sounds of it or a cell phone.
13  Q.  Okay.  So you're -- are you picking up a
14  physical phone to make that call?
15  A.  No, push a button on the computer.
16  Q.  Okay.  And then you're making a call on a
17  line that's connected to the computer, correct?
18  A.  Yes, sir.
19  Q.  Okay.  And that would have been -- I'm
20  sorry.  Let me start over.  Would you call that
21  the non-emergent line?
22  A.  It would have been a in-office line if it
23  was a work, like at the desk, or it would have
24  been non-emergent line if it was their cell phone.
25  Q.  Okay.

Page 36

1  A.  Yes.
2  Q.  So on that recording, you are talking to
3  a deputy about the Snak Atak incident?
4  A.  Yes, sir.
5  Q.  Okay.  And I'm going to represent to you
6  that that occurred on May 28th, 2024.  Do you have
7  any reason to think that it wouldn't have been May
8  28th, 2024?
9  A.  No, sir.
10  Q.  Okay.  There was a part of the audio
11  recording -- and if you need me to play it again,
12  just let me know.  There was a part of the audio
13  recording where you say to the deputy something to
14  the effect of Tim has told us to arrest the Tribal
15  police if they don't leave?
16  A.  Yes, sir.
17  Q.  Okay.  You heard that?
18  A.  Yes, sir, I heard that.
19  Q.  Okay.  Why did you say that?
20  A.  Again, that would have been with the
21  criminal trespassing from my supervisor, which if
22  you refuse to leave with criminal trespassing you
23  can be arrested.
24  Q.  Okay.  It sounded like you were saying
25  Tim told us or words to those effect.  Can you



Page 37

1 **explain why you said that if the sheriff didn't**
2 **actually tell you directly?**
3     A.  I mean because, so, for instance, I'm in
4 the military.  If my commander tells my first
5 sergeant to tell me as a platoon sergeant to tell
6 my quad, if I say, hey, we're going to go do
7 this, that initially comes from my commander.
8 He's the one.  But that's who they assume.  Now,
9 if I as the platoon sergeant say, hey, we're going
10 to go do this.  This is what they said, then that
11 falls on me if they didn't actually say that.  It
12 doesn't fall on the commander.  So it's all in
13 good faith but also hearsay.  Like I have to
14 believe nobody would lie to me, but I'm also
15 getting it from my people.
16     Q.  Okay.  And who did you get it from?
17     A.  Again, I would -- recollection would have
18 been from either my supervisor or the deputy
19 sergeant that day.
20     Q.  Okay.  So --
21     A.  But that -- in a roundabout way, it was
22 from my recollection of, hey, if we get a call,
23 we're going to handle it this way because if it
24 becomes criminal trespass if they don't leave.
25     Q.  And who would have said that in your

Page 38

1 **recollection?**
2     A.  Would have been my supervisor.
3     Q.  Okay.  So when you say Tim told us or
4 **words to those effect, that wasn't true?**
5     A.  Correct.
6     Q.  Okay.
7     A.  He did not tell me directly.  He did not
8 come in the dispatch office directly.
9     Q.  Okay.  So you were saying -- well, let me
10 **ask you again.  How were you intending that**
11 **statement to come across to the deputy?**
12     A.  That if they the Snak Atak needed us,
13 they were being harassed, you guys on scene figure
14 out best situation.  But if they won't leave, you
15 can proceed with normal.
16     Q.  But why did you say Tim told us or words
17 **to those effect?**
18     A.  Because that, again, my supervisor said
19 if it proceeds like this, it will be arrest.
20     Q.  Did your supervisor say that the sheriff
21 **had told him that?**
22     A.  Without having a con -- because I won't
23 lie.  I don't remember that phone conversation.
24 But without having a recording or hearing
25 something play back, I couldn't say exactly what

Page 39

1 was said.
2     Q.  Yeah.  But it's fair to say that you
3 **understood that day that the sheriff wanted --**
4     A.  But I didn't hear the sheriff say that,
5 no.
6     Q.  Right.  But your understanding would have
7 **been that Sheriff Morse wanted the Tribal PD folks**
8 **arrested if they did not leave the Snak Atak?**
9     A.  My under --
10         MR. COOPER:  Object to form.  Go ahead.
11     A.  My understanding is that the sheriff
12 would want normal processes to happen which would
13 lead to that if there was a criminal trespass in
14 order.
15     BY MR. COWAN:
16     Q.  Okay.  But you don't recall the sheriff
17 **ever saying in a way that you heard directly I**
18 **want those Tribal PD folks arrested?**
19     A.  No, sir.
20     Q.  Okay.
21         MR. COWAN:  I am going to play the video
22 -- the audio one more time just to make sure I'm
23 not forgetting anything, so bear with me.
24         (THEREUPON, the video was played.)
25     BY MR. COWAN:

Page 40

1     Q.  Okay.  At the beginning of that call,
2 **you're referring to the facts about the taxation**
3 **and Snak Atak and the Tribe.  Where did you come**
4 **to understand those facts?**
5     A.  Again, that would have been within the
6 talk throughout the week.  Obviously, they had
7 other calls and deputies went out and talked to
8 Snak Atak and that much, because I don't -- I
9 don't remember, again, without having a recording
10 of what Snak Atak said directly.  I just remember
11 getting a call saying they needed sheriff's office
12 out there.
13     Q.  So that -- your understanding about the
14 **tax issues could have come from conversations with**
15 **supervisors, other dispatchers, maybe deputies**
16 **around the office?**
17     A.  Yes, sir.
18     Q.  Okay.  But you don't recall the Snak Atak
19 **representative who called dispatch that day**
20 **explaining all those tax issues to you?**
21     A.  I don't remember that that day, no.
22     Q.  Okay.  And you also mentioned that the
23 **Tribe was serving a notice --**
24     A.  Um-hum.
25     Q.  -- or words to that effect on Snak Atak



Page 41

1 that day?
2   A. Um-hum.
3     MR. COOPER: That was a yes?
4     THE WITNESS: Sorry.
5     MR. COOPER: That was a yes? You said
6 um-hum.
7     THE WITNESS: Yes. I'm sorry.
8     MR. COWAN: Thank you, David.
9     THE WITNESS: I'm sorry.
10  BY MR. COWAN:
11   Q. No worries. Where did you come to
12 understand that a notice had been served by the
13 Tribe on Snak Atak?
14   A. Listening to that recording, I would
15 guess it was from when Snak Atak called. I don't
16 know a hundred percent.
17   Q. When they called you that day?
18   A. I'm guessing that's -- yes.
19   Q. Okay. Do you have a sense of how long
20 your conversation was with the Snak Atak
21 representative that day?
22   A. No, sir, I don't.
23   Q. Okay. I have what I think are the exact
24 words that I've been asking you about.
25   A. Um-hum.

Page 42

1   Q. Or if they're not exact I think they're
2 pretty close because I wrote them down during the
3 recording. You said essentially we were told by
4 Tim to arrest them if they refuse to leave. Did
5 you hear that?
6   A. Yes, sir, I heard that.
7   Q. Okay. Who is Tim?
8   A. Well, Tim would be the sheriff. But
9 again, it comes down the pipeline. If say, again,
10 back to my military, if I say I'm telling you to
11 do this, they take it as the commander is telling.
12 I don't have to say the commander's telling you to
13 go do PT. It's I'm telling you to go do PT.
14   Q. So when you say, quote, we were told by
15 Tim, unquote, you didn't mean that Tim had
16 actually said something to you, Bethany Streeter?
17   A. Correct.
18   Q. Okay. It was something you understood
19 from your conversations with your supervisor?
20   A. Yes, sir.
21   Q. Okay. How long were you in the military?
22   A. I'm still serving. I have 17 years in.
23   Q. Okay. Is that National Guard?
24   A. Army Reserves.
25   Q. Army Reserves. Okay. And have you been

Page 43

1 deployed?
2   A. Twice.
3   Q. Where to?
4   A. Kuwait in Iraq and then to Poland.
5   Q. And what's your -- I apologize. I have
6 not been in the military so I'm going to mess this
7 up, but what is your rank?
8   A. Staff sergeant.
9   Q. Okay.
10   A. And my position is platoon sergeant.
11   Q. Okay. And just to be clear, you're
12 saying that the words you used on the recording
13 about being told by Tim to arrest them if they
14 refused to leave is a holdover from your military
15 experience where you would have been communicating
16 a higher level person's orders that had trickled
17 down through the organization to you?
18   A. Yes. It would have come from my
19 supervisor. And whether he took it out of
20 context, whether other people took it out of
21 context that told him, I don't know who told him,
22 but yes.
23   Q. Okay. But your understanding based on
24 the audio recording we just listened to is that
25 the sheriff wanted them to be arrested if they

Page 44

1 refused to leave?
2   A. My --
3     MR. COOPER: Object to form. Go ahead.
4   A. My understanding is that the sheriff
5 would want protocol to be followed which could
6 lead up to that, yes.
7  BY MR. COWAN:
8   Q. Okay. But you didn't say protocol should
9 be followed?
10   A. But that's what is understood, yes.
11   Q. Okay. But you said we were told by Tim
12 to arrest them if they refused to leave which is a
13 very specific thing to say. You must have had
14 some understanding that the sheriff wanted them to
15 be arrested if they refused to leave in order to
16 make that statement?
17     MR. COOPER: Object to form, foundation.
18 You may reanswer the question if you can.
19   A. So it goes from other types of calls
20 that, again, I believe I spoke about earlier. If
21 we talked about, hey, we've had a bunch of
22 domestics at this house. If they call one more
23 time, someone's going to get arrest. We've had a
24 bunch of animal cruelty investigations. If
25 someone calls, we're going to do something about

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street      6420 W 95th Street        800 E 1st Street N
Topeka, KS 66604         Suite 101                 Suite 200
785-273-3063             Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com      913-383-1131              316-201-1612

Page 45

1  it. It goes to that effect, yes.
2      MR. COWAN: Okay. I just have one
3  document I'd like to show you.
4      (THEREUPON, a discussion was had off the
5  record; WHEREUPON, Streeter Deposition Exhibit
6  No 1 was marked for identification by the
7  reporter.)
8      BY MR. COWAN:
9      Q. Okay. You have before you, Miss
10 Streeter, Exhibit 1. Can you tell me if you
11 recognize this document?
12     A. Yes. It's our call history at the
13 sheriff's office.
14     Q. Okay. And what day would this call
15 history be from?
16     A. May 28, 2024.
17     Q. And do you recognize any calls that you
18 did on this form?
19     A. I'm the one that created it, yes.
20     Q. Okay. The first entry says 28 May, '24
21 with a timestamp, and it says entered. What does
22 that mean?
23     A. Entered, that means that I created the
24 call which means I took the call from the
25 individual, the reporting party.

Page 46

1      Q. Okay. And that would have been the Snak
2  Atak representative?
3      A. Yes, sir.
4      Q. Okay. And so the way these work, it's
5  called a call history synopsis?
6      A. Um-hum.
7      Q. Everything on this form would have to do
8  with that Snak Atak incident?
9      A. Yes, sir.
10     Q. Okay. Entering it just means you created
11 it?
12     A. Yes, sir.
13     Q. Okay. Then the next -- down a little
14 bit, there's a text entry, seven lines down. Can
15 you read that? Oh.
16     A. That says --
17     Q. Not that far. Hold on. It's -- I'm
18 sorry. It's -- do you see the entry that says
19 initiated 57 --
20     A. Yes.
21     Q. -- Bethany Streeter?
22     A. Yes.
23     Q. Just above that there's a line with some
24 text. Can you read that?
25     A. Says Tribal PD employees are saying they

Page 47

1  won't leave.
2      Q. Okay.
3      A. Which is what the RP would have stated,
4  the reporting person would have stated.
5      Q. And the reporting person would be the
6  Snak Atak representative?
7      A. Yes, sir.
8      Q. Okay. So is it fair to read that as
9  Tribal Police Department are at Snak Atak. The
10 Snak Atak employees are saying the Tribal PD won't
11 leave?
12     A. Correct, sir.
13     Q. Okay. I'm just trying to understand.
14     A. Um-hum.
15     Q. Okay. What does the next line initiated
16 mean?
17     A. It means I -- so entered is when I start
18 typing. Initiate is when you truly create it and
19 then on down.
20     Q. Okay. The next one is dispatched at 5:50
21 p.m.?
22     A. Um-hum, yes, sir.
23     Q. What would that mean?
24     A. So I dispatched 309, Maverick Ohlde, and
25 then that next one wasn't me, Maverick Ohlde,

Page 48

1  which means I called over the radio to send him to
2  the call, either the radio or phone depending on
3  where he was at.
4      Q. And is Maverick Ohlde a deputy?
5      A. He was a deputy, yes.
6      Q. Okay. Do you know whether he actually
7  went to Snak Atak that day?
8      A. It does not look like he went. I don't
9  know if he was the north guy. So he was just --
10 because it looks like my partner also dispatched
11 the other two. And so if we had more people
12 going, then he stayed out for other calls.
13     Q. Okay. Think back to the audio recording
14 we listened to. Would that audio recording be
15 entered on this sheet?
16     A. It's -- no. This is all -- oh, he did go
17 on scene. Thank you.
18     Q. Oh, thank you. So Maverick Ohlde did go
19 on scene?
20     A. Did go on scene.
21     Q. Okay.
22     A. I was looking down further. I apologize.
23     Q. No, no, that's fine. Thank you. Can you
24 just explain to me how we have this recording of
25 you talking to a deputy about the Snak Atak


5111 SW 21st Street  
Topeka, KS 66604  
785-273-3063  
www.appinobiggs.com

6420 W 95th Street  
Suite 101  
Overland Park, KS 66212  
913-383-1131

800 E 1st Street N  
Suite 200  
Wichita, KS 67202  
316-201-1612

Page 49

1  incident but it's not on this form?  Why isn't it
2  on this form?
3      A.  Because this is what our CAD does versus
4  what we do on the phone.  It's not -- it's
5  recorded on a recording.  It's not always in this.
6      Q.  Okay.  So when you say CAD, what does
7  that mean?
8      A.  The computerized automatic dispatch
9  system.
10     Q.  It's the computer system?
11     A.  Yeah, um-hum.
12     Q.  Okay.  So the computer system is spitting
13 out things that happened on the computer system on
14 this form?
15     A.  Yes.  Yes, sir.
16     Q.  Okay.  And actual calls such as the audio
17 recording we listened to are not necessarily
18 printed out on this call history synopsis?
19     A.  Correct, sir.
20     Q.  Okay.  So do you have any reason to
21 believe that the audio recording we listened to is
22 not a true and accurate recording of your
23 conversation?
24     A.  No, I don't have any reason to believe
25 it's been altered, no.

Page 50

1          MR. COWAN:  Okay.  I don't think I have
2  any further questions.
3          CROSS-EXAMINATION
4          BY MR. COOPER:
5      Q.  This is Morse 11.
6          (THEREUPON, the video was played.)
7          BY MR. COOPER:
8      Q.  I'm not going to ask you who the male's
9  voice was because I don't know that you know.  Who
10 was the female voice?
11     A.  The female voice was me, sir.
12     Q.  Okay.  And was that you answering the
13 phone call whether it was 911 or non-emergent?
14     A.  Yes, sir.
15     Q.  Do you know if it -- based on the
16 recording, can you tell if that's a 911 line or
17 the non-emergent line?
18     A.  I would have to hear the beginning again
19 because usually we answer it certain ways.
20     Q.  Okay.  Let me start it.
21         (THEREUPON, the video was started
22 briefly.)
23     A.  Actually, sir, he said he was 20, 25
24 minutes away, so that means it wasn't a 911
25 because it wouldn't bounce to us probably.  So it

Page 51

1  probably came in as a non-emergent.
2          BY MR. COOPER:
3      Q.  And when it starts you say sheriff's --
4  you say sheriff's office.
5      A.  Yeah, so that's not a 911.
6      Q.  And how do you distinguish between a non-
7  emergent line phone call answer versus a 911 call
8  answer?
9      A.  911 call is always answered Jackson
10 County 911, where is your emergency?
11     Q.  Okay.  And looking at Exhibit 1, I'm
12 going to -- this is just esoteric, but he
13 identified the store as the Indian Country Store
14 and not the Snak Atak.  Do you agree?
15     A.  Yes, sir.
16     Q.  Okay.  You drove by there coming down
17 today.  Do you know what the sign says today?
18     A.  I don't know what the sign says because I
19 don't believe it has one since it's closed.
20     Q.  Okay.  Memory test.  Maverick Ohlde was
21 309?
22     A.  Yes, sir.
23     Q.  Deputy Jose Martinez, 315?
24     A.  Yes, sir.
25     Q.  Let me get down to Deputy Bryce Whelpley

Page 52

1  is 316?
2      A.  Yes, sir.
3      Q.  I'm just going to tell you that we've got
4  body cam video from Martinez and Whelpley that
5  shows the three of them there.  Who is 313?
6      A.  313 is -- I can see his face.  I can't
7  think of his name.  His first name is Travis I
8  think.
9      Q.  DeBarge?
10     A.  DeBarge, yes.  Sorry.  Travis DeBarge.
11     Q.  And 301?
12     A.  Is the sheriff.
13     Q.  Actually, and it does say 45,
14 miscellaneous non-emerge?
15     A.  Yes, sir.
16     Q.  Okay.  At the very top of Exhibit 1.  I
17 didn't hear him identify himself, but it says
18 reporting person Raja Rain.  Do you know where you
19 got that information?
20     A.  I'm -- again, this is assuming, but
21 usually if the deputy comes back with, hey, this
22 is the individual's name that called you, that's
23 how we go back in and put it in.
24     Q.  So you can populate the reporting party
25 name --

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W 95th Street        800 E 1st Street N
Topeka, KS 66604               Suite 101                 Suite 200
785-273-3063          Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

Page 53

1  A.  Yeah, the --
2  Q.  -- later?
3  A.  Sorry.  I apologize.  Yes, I can always
4  put it back in later.
5  Q.  And the phone call that originated the
6  call, does that self-populate in the CAD?
7  A.  Yes.  When they call in the line, it pops
8  up.  And that name may have popped up on his line
9  as well if it was a cell phone.  Like when I call
10 into the sheriff's office, it shows my name.
11 Q.  When you called me, it says Bethany
12 Streeter.
13    Just there's -- in terms of going down the
14 line, there's entered, initiated.  You discussed
15 that already.  There's three lines of dispatch for
16 309, 316 and 315?
17 A.  Yes, sir.
18 Q.  Do you know if that's via radio, phone or
19 hollering out the door?
20 A.  So it -- the dispatch is when we moved
21 the call to them on the CAD, on the computer.  So
22 I do not know if it was via radio or like via
23 phone call.
24 Q.  And but --
25 A.  Usually it's radio.

Page 54

1  Q.  But I'll grant you that usually they're
2  not sitting right there.  But when it says
3  dispatched, were the three items that I gave you
4  radio, phone call or talking to them yelling out
5  the door, are those all options by which somebody
6  could be dispatched?
7  A.  Yes, sir.
8  Q.  On scene, what does that mean?
9  A.  On scene is when the deputy radios us
10 saying they're on scene.
11 Q.  Okay.  Then there's a memo by Meagan
12 saying 313 to 301 were advised.  313 is Travis
13 DeBarge?
14 A.  Yes, sir.
15 Q.  Was he a sergeant then?  He's a captain
16 now.
17 A.  I -- he got captain before I -- or
18 lieutenant I thought before I left.  I honestly
19 don't know if he was captain before I left.
20 Q.  Okay.  And the reason I'm asking that is
21 you repeatedly mentioned the deputy supervisor
22 being a sergeant.  Could that person have also
23 been a lieutenant?
24 A.  It could have been, yes.
25 Q.  Okay.  Looks like Whelpley, was he a

Page 55

1  sergeant then?
2  A.  He was a sergeant then.
3  Q.  Sergeant Whelpley was the last to arrive?
4  A.  Yes, sir, it looks like it.
5  Q.  And then there's cleared notebook,
6  cleared notebook, cleared notebook.  What does
7  that -- what do those entries mean?
8  A.  That is when the deputy says they are
9  clear of scene.
10 Q.  I'm trying to look to see if there's any
11 more notes that need explaining on here.  At the
12 top of Exhibit 1, it says clear type: Notebook.
13 Officer: Jose Martinez.  Does that mean this is
14 his call or that was his assigned beat?
15 A.  That means it was his call.  He was the
16 one that would officially take the call.
17 Q.  Okay.
18 A.  The No. 1 deputy, I guess you could say,
19 for the call.
20 Q.  Do you have -- have you been put on
21 notice that you may have orders coming in the next
22 four months?
23 A.  No, sir.
24 Q.  Do you usually have that much advanced
25 notice if you've going to be put on orders?

Page 56

1  A.  For the most part yes.  For annual
2  training, not always.
3  Q.  I'm working on getting to it.  There's a
4  reason I'm asking that.  Not that we want this to
5  go to trial, but there's a trial setting in this
6  case.  It's set for trial in July, July 6th.  Is
7  there any reason you will not be in Kansas during
8  that period of time?
9  A.  Not that I know of.  I know our annual
10 training is usually June/July.  I just don't have
11 exact dates.  And there's also a possibility of me
12 moving to Louisiana in the next six months to a
13 year.
14 Q.  Okay.  I think Mr. Cowan asked you this
15 six ways from Sunday, but I'm going to ask it a
16 little bit differently.  Have you ever talked to
17 Tim Morse about the Snak Atak incident?
18 A.  No, sir, not to my recollection.
19    MR. COOPER:  Okay.  That's all I have.
20    (THEREUPON, the deposition concluded at
21 10:26 a.m.)
22 .
23      (WAIVED)
24      BETHANY GAIL STREETER
25 .

**BETHANY GAIL PIKE STREETER**

```
                                            Page 57
 1              CERTIFICATE
 2   STATE OF KANSAS
 3   COUNTY OF SHAWNEE
 4       I, Sandra S. Biggs, a Certified Court
 5   Reporter, Commissioned as such by the
 6   Supreme Court of the State of Kansas,
 7   and authorized to take depositions and
 8   administer oaths within said State
 9   pursuant to K.S.A 60-228, certify that
10   the foregoing was reported by
11   stenographic means, which matter was
12   held on the date, and the time and place
13   set out on the title page hereof and
14   that the foregoing constitutes a true
15   and accurate transcript of the same.
16       I further certify that I am not
17   related to any of the parties, nor am I
18   an employee of or related to any of the
19   attorneys representing the parties, and
20   I have no financial interest in the
21   outcome of this matter.
22       Given under my hand and seal this
23   19th day of December, 2025.
24       _____
25       Sandra S. Biggs, C.C.R No. 0716
```



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E 1st Street N
Suite 200
Wichita, KS 67202
316-201-1612